The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| LINDA SHORT, OLIVIA PARKER, ELIZABETH SNIDER, JENNIFER DIPARDO, ANTHONY DIPARDO, SEANE RONFELDT, JAMES TWIGGER, GABRIELLE ALEXANDER, TAVISH CARDUFF, BRIAN FRAZIER, CHAD PERRY, WILLIAM PRESSLEY, JEANETT SMITH, AND JANELL WIGHT on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA, INC., HYUNDAI MOTOR COMPANY, KIA MOTORS AMERICA, INC., and KIA MOTORS CORPORATION,<br><br>Defendants. | No. 2:19-cv-318-JLR<br><br>SECOND AMENDED CONSOLIDATED COMPLAINT—CLASS ACTION<br><br>JURY DEMAND |

TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. PARTIES ..... 13

A. Defendants ..... 13

B. Plaintiffs ..... 14

III. JURISDICTION AND VENUE ..... 31

IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ..... 31

1. 2011-2013 Hyundai Tucson 2.4-liter and 2012-2016 Kia Soul 1.6- and 2.0-liter Engines Have Serious Safety-Related Defects. ..... 33

2. Hyundai and Kia Have Long Experience With Defects In Related Engines That Can Result in Engine Failure and Fires. ..... 42

3. Defendants Knew About Defects in the Class Vehicles Before Any Named Plaintiff Purchased a Class Vehicle, But Consistently and Actively Concealed Them. ..... 45

4. Defendants Continuously Touted Class Vehicles as Safe and Dependable, Concealing the Engine Defect ..... 66

5. Defendants' Concealment of the Defects in the Engines Caused Class Members Significant Harm. ..... 74

6. Defendants' Recalls and Proposed Fixes Are Insufficient ..... 75

V. CLASS ACTION ALLEGATIONS ..... 76

A. Class Definitions ..... 76

B. Class Certification Requirements ..... 78

VI. EQUITABLE TOLLING ..... 82

A. Discovery Rule ..... 82

B. Fraudulent Concealment ..... 83

C. Estoppel ..... 84

VII. CLAIMS FOR RELIEF ..... 84

COUNT I FRAUD BY CONCEALMENT (Common Law) ..... 85

COUNT II IMPLIED AND WRITTEN WARRANTY Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301 *et seq.*) ........................................................ 88

COUNT III VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) ............................................. 89

COUNT IV VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) ............................................. 90

COUNT V VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 *et seq.*)............................................................... 92

COUNT VI VIOLATIONS OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTIES (Cal. Civ. Code §§ 1791.1 & 1792)............................................................... 96

COUNT VII VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (O.R.C. §§ 1345.01, *et seq.*)............................................. 96

COUNT VIII VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (O.R.C. §§ 4165.01, *et seq.*)............................................. 99

COUNT IX VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY (O.R.C. §§ 1302.27 and 1310.19).............................. 99

COUNT X VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECION LAW (73 P.S. §§ 201-1, *et seq.*) .........................................................................................101

COUNT XI VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY (13 Pa. C.S.A. § 2A212)..........................................104

COUNT XII VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (Wash. Rev. Code §§ 19.86.010, *et seq.*) ......................104

COUNT XIII BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212) ..............................................................................................107

COUNT XIV VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (W. Va. Code §§ 46A-1-101, *et seq.*)..................108

COUNT XV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (W. Va. Code §§ 46-2-314 and 46-2A-212).............112

COUNT XVI VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (Ariz. Rev. Stat. §§ 44–1521 *et seq.*)..........................................................113

COUNT XVII BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Ariz. Rev. Stat. §§ 47–2314 *et seq.*)........................115

COUNT XVIII VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Conn. Gen. Stat. §§ 42-110a *et seq.*)..............................116

COUNT XIX BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Conn. Gen. Stat. §§ 42a-2-314 and 42a-2a-504)......118

COUNT XX VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (Mo. Rev. Stat. §§ 407.010 *et seq.*).................................119

COUNT XXI BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Mo. Rev. Stat. §§ 407.2–314 *et seq.*).......................121

COUNT XXII VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)...........................................................................................122

COUNT XXIII BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212)..........124

COUNT XXIV VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT (Tex. Bus. & Com. Code §§ 17.01, *et seq.*)......................................................................125

COUNT XXV BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Tex. Bus. & Com. Code §§ 2.314 and 2A.212, *et seq.*)..........................................................................................127

VIII. PRAYER FOR RELIEF ..........................................................................................128

IX. DEMAND FOR JURY TRIAL.......................................................................................130

Plaintiffs bring this action on behalf of themselves and all others similarly situated, against the Defendants collectively referred to as "Hyundai"—Hyundai Motor America, Inc., ("HMA") and Hyundai Motor Company ("HMC")—and the Defendants collectively referred to as "Kia"—Kia Motors America, Inc., ("KMA") and Kia Motors Corporation ("KMC").[1] Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as the factual allegations pertaining to themselves.

## I. INTRODUCTION

1. This case arises out of Defendants' longtime failure to disclose or remedy several serious safety-related defects of design and manufacturing in the engines of the 2011-2013 Hyundai Tucson and the 2012-2016 Kia Soul (the "Class Vehicles"). Despite Defendants' knowledge of the defects, no recall was announced for any of the Class Vehicles until February 2019, despite having defects that create a clear safety hazard, making them unfit to drive—namely, that the engines could suddenly stall while driving at speed, and in some cases, *burst into flames*. When recalls were finally announced and subsequently rolled out, they covered only two of the three engines among the Class Vehicles and did not adequately remedy the defects.

2. HMA represents that "[n]othing is more important than the safety and security of Hyundai customers,"[2] but its conduct in this case shows that this is anything but true.

3. Hyundai and Kia knew about these safety-related defects before these vehicles were ever offered for sale. Defendants received NHTSA complaints from consumers about the

---

[1] The Hyundai Defendants and Kia Defendants are collectively referenced as "Defendants."

[2] Rosa Marchitelli, *"Companies Knew They Had a Big Problem…"* CBC (Mar. 27, 2019). https://www.cbc.ca/news/business/car-owners-claim-they-were-knowingly-sold-defective-vehicles-1.5073563 (last visited Apr. 28, 2020).

same types of defects and resultant engine failures, stalls, or fires in the same engines—already used in other vehicles—as early as 2010, and they represent that they conduct rigorous durability testing before vehicles, including the Class Vehicles, enter mass production. These tests are conducted at the jointly-run "Hyundai-Kia Motors California Proving Grounds." Proving Grounds officials represent that the facility can "get five years' wear and tear" on a vehicle;[3] the test roads on the grounds are "so rigorous" that Hyundai-Kia claims to mimic 60,000 miles of use when driven only 10,000[4] or "five years' wear and tear [there] in just six months."[5]



4. The purpose of durability testing of the type Hyundai and Kia perform is to identify defects of this type before production vehicles are sold to consumers. The defects of

---

[3] Autocar, *Behind the scenes at Kia's desert testing facility* (June 2, 2018), https://www.autocar.co.uk/car-news/new-cars/behind-scenes-kias-desert-testing-facility (last visited April 29, 2020).

[4] Jose Antonio Lopez, *Roads less Traveled: Vehicle Testing in the Mojave Desert* (March 28, 2014), https://thekoreancarblog.com/2014/03/28/roads-less-traveled-vehicle-testing-in-the-mojave-desert/ (last visited April 29, 2020).

[5] *See supra* note 2.

design or manufacturing alleged herein are present and manifest at the time of manufacture and delivery of the Class Vehicles, but do not usually cause catastrophic engine damage until the vehicles have been driven for some time and miles (though frequently near warranty period expiration): as described in Defendants' recall notices, the damage accrues and worsens over time. Defendants' durability testing on Class Vehicles, whether at the Proving Grounds or elsewhere, revealed these defects: the tests specifically duplicate the effects on engine durability and performance of driving tens of thousands of miles.[6]

5. The engines in the Class Vehicles share their overall design and manufacturing processes with closely related engines Defendants use in other vehicle models. For example, the Tucson Class Vehicles share their 2.4-liter Theta II engine with the 2011-2012 Sonata, and the 1.6-liter "Gamma" engine used in over 300,000 Kia Soul Class Vehicles was also used in vehicles such as Hyundai's Accent, Elantra, and Veloster models, as well as in Kia's Sportage and Forte.

6. Defendants viewed NHTSA complaints and received warranty claims for engine defects similar to those present in the Class Vehicles in different models or years with the same or closely related engines, including in 2011 and early 2012 for 2010 and 2011 model year Kia Souls, in June 2012 for the 2011 Kia Sportage, December 2011 for the Theta II engine in the 2010 Hyundai Santa Fe, and December 2010 for the 2011 Hyundai Sonata.

7. Unlike the Class Vehicles, though, Defendants recalled many of the related models with similar defects, particularly for the Theta II used in the Tucson. In 2015, Hyundai

---

[6] Kim Dong-Jin, *Vice Chairman of Hyundai Motor Company Local Officials Celebrate the Innovative Proving Ground* (Jan. 26, 2005), https://www.hyundainews.com/en-us/releases/393 (last visited Aug. 19, 2019).

issued a recall for the 2011-2012 Sonata, due to reports that the engine was stalling at speed. The Theta II in the Sonata is the same engine design used in the Tucson Class Vehicles. Despite similar complaints about the Tucson, Hyundai issued no recall until 2019, and even then, a woefully inadequate one. In 2019, Hyundai recalled the 2013 Veloster equipped with a Gamma engine, similar to one found in the Kia Soul, due to widespread issues of engine damage and non-collision fires.

8. Even if they had not learned of the defects through durability testing designed to detect them, and although the Class Vehicles used engines that had already exhibited defects in other vehicles, Hyundai and Kia knew of the defects in the Class Vehicles before Plaintiffs purchased or leased them through a combination NHTSA complaints and warranty claims. These complaints and warranty claims began, at the latest, in May 2012 for the Kia Soul and June 2013 for the Tucson.

9. For several years, Hyundai and Kia knew about the engine defects in Class Vehicles but consistently concealed this knowledge. In addition to NHTSA complaints and recalls of vehicles with the same or related engines, Kia, as it now admits, altered catalytic converter programming in Souls equipped with the 1.6-liter "Gamma" GDI engines for the 2017 model year in order to prevent the types of stalls and fires experienced by drivers of 2012-2016 1.6-liter Soul Class Vehicles. Obviously, the defect—and a possible way to prevent resulting engine damage—was known to Kia early enough that it had time to develop new programming, test it, and receive emissions certification before the 2017 Soul entered production in early 2016—on this basis and on information and belief, at least as early as 2015. Kia did nothing to notify owners of 2012-2016 1.6-liter Souls until, in 2019, it announced that part of its recall would entail implementing the programming used since the 2017 model year.

10. Failing to recall the Class Vehicles despite recalls of closely related vehicles saved Defendants considerable amounts of money: Kia sold close to 700,000 Soul Class Vehicles in the United States, and Hyundai sold at least 120,000 Tucson Class Vehicles. The recalls of vehicles with closely related engines often entailed expensive engine replacements—one of the consequences suffered and paid out of pocket by some Plaintiffs and Class Members, if their vehicle wasn't destroyed by a resulting fire.

11. Hyundai and Kia failed to correct or disclose these dangerous defects to their customers, claiming instead, for example, that "[t]here's one thing missing from every Hyundai. Worry."[7]




But worry—particularly worry about safety—is at the heart of Plaintiffs' claims. Many Plaintiffs are justifiably worried that their vehicles could, at any time, suddenly stall, while driving at speed, then burst into flames. The only Plaintiffs who are not worried that his or her car could

[7] https://www.hyundaiusa.com/new-thinking/quality.aspx, available at https://web.archive.org/web/20130116092630/https://www.hyundaiusa.com/new-thinking/quality.aspx (last visited Aug. 19, 2019).

burst into flames are the Plaintiffs whose vehicles already caught fire, like Plaintiff James Twigger, whose 2014 Kia Soul equipped with the 2.0-liter "Nu" engine already did:



Plaintiff Twigger, unfortunately, is not alone in having undergone such a horrifying experience, as evidenced by the experiences of Plaintiffs Smith, Frazier, and Wight and the various news articles and NHTSA complaints detailed below. Although they did not result in fires, Plaintiffs Carduff, Pressley, and Ronfeldt experienced catastrophic engine failures as well.

12. Despite what Hyundai and Kia knew about the safety-related defects present in Class Vehicles, Defendants failed to disclose the defects for years, leading to hundreds or thousands of engine failures, sudden stalls, and fires.

13. Only recently—after years of failing to disclose serious safety defects—have Hyundai and Kia begun to recall certain of these vehicles. But even then, there is a vast distance between a recall and a reliable fix, as thousands of consumers know all too well.

14. In the case of the Tucson Class Vehicles, Hyundai acknowledged in a 2019 letter to owners and lessees of 2011-2013 Tucson vehicles that the defect relates to an "important safety matter" that could "lead to a high-speed stall, increasing the risk of a crash," and "could also increase the risk of an engine fire." Hyundai did not offer any actual repair at the time,

instead exhorting consumers to wait patiently. This means that Hyundai offered only a vague promise of a future repair and then only six to nine years after the dangerously defective vehicles entered the stream of commerce and almost ten years after consumers started filing NHTSA complaints related to the defects. The letter amounted to pie in the sky for thousands of consumers stuck in limbo, knowing their vehicle has potentially fatal flaws, but powerless to act on this knowledge. Adding insult to injury, as described more fully below, the recall that was finally announced will be inadequate to remedy the problem or to compensate the customers who bought vehicles without knowing that they were at risk to suddenly stall while driving or, worse, burst into flames.

15. Moreover, the proposed recalls do not go far enough. Kia's proposed recall of the Kia Soul covers 375,000 vehicles equipped with one engine—the 1.6-liter "Gamma" engine—but does not address Kia Soul vehicles equipped with what is, on information and belief, a second defective engine, the 2.0-liter "Nu" engine. The 2.0-liter engine—as Plaintiffs Twigger, Smith, Frazier, and Wight's experiences demonstrate—is similarly subject to fire risk. This is despite earlier recalls of other vehicles featuring the same and closely-related engines for similar defects.

16. For the Hyundai Tucson, Hyundai finally announced a repair in July 2019, but it is woefully inadequate. Hyundai proposes to check the oil pan for evidence of leakage, and only if such evidence is present, replace and reseal the oil pan; Hyundai also proposes to install a new oil pressure switch (implying both that the previous switch was defective in that it did nothing to prevent engine damage due to oil leakage, and that further oil leakage resulting in low pressure is expected). For those whose engines have already been damaged in the six to nine years they have been on the road with the defect unremedied, this recall will do nothing, and those consumers

with damaged engines will be made to continue driving while at risk of engine failure or fire. At best, the fix provides the possibility that the new oil sensor will warn drivers when oil pressure becomes dangerously low but before the engine stalls or bursts into flames. This kind of inadequate fix is not uncommon for Hyundai and Kia—they have been attempting similarly inadequate fixes for other vehicles' defective engines for years. The failures of those inadequate repairs are the subject of ongoing litigation elsewhere.

17. Not only have numerous Hyundai and Kia vehicles been previously recalled for serious defects, which is concerning in and of itself, but the companies' track record of actually fixing the vehicles that it recalls is also problematic. In the past, Hyundai and Kia have recalled numerous other models with closely related engines to repair defects that could lead to engine failures and fires, but the failures and fires have recurred despite the recalls. Hyundai and Kia are recalling many of those vehicles yet again for the same problems. Consumers have every reason to suspect that a recall for the vehicles at issue in this Complaint—which were not part of the previous recalls but appear to suffer from similar defects—at this late date will not be an adequate solution.

18. Further, these consumers also have every reason to suspect that now that the problems have become known and publicized, the market values of their vehicles have decreased significantly. Because Defendants concealed the defective engines in the Class Vehicles, these consumers did not get the vehicles they bargained for at the time of purchase, have gone years without an adequate repair, have driven their vehicles for years without knowing their vehicles suffered from serious safety defects, may have suffered diminished resale value, and cannot now be made whole merely by recalling and repairing the vehicles.

19. According to the National Highway Traffic Safety Administration (NHTSA), Hyundai is recalling 120,000 Tucsons, and Kia is recalling over 378,000 Souls with the 1.6-liter "Gamma" engine, each of which suffers from a serious defect. On information and belief, there are another roughly 300,000 Souls equipped with the 2.0-liter "Nu" engine that are also defective but are not currently the subject of any proposed recall. The affected vehicles ("Class Vehicles") are as follows:

| **Model Years** | **Model and Defective Engine** | **Likely or Reported Safety-Related Defect(s)** | **Number of Affected Vehicles** |
|---|---|---|---|
| 2012-2016 | Kia Soul 1.6-liter "Gamma" | Engine suddenly stalling at speed and bursting into flame because, according to Kia, the catalytic converter is susceptible to overheating, ultimately causing connecting rods to fracture engine block. | 378,967 |
| 2012-2016 | Kia Soul 2.0-liter "Nu" | Engine suddenly stalling at speed and bursting into flame when connecting rods fracture engine block due to catalytic converter susceptible to overheating, debris left in engine during manufacturing, and/or oil starvation and lubrication failure. | 300,000+ |
| 2011-2013 | Hyundai Tucson 2.0-liter "Theta II" | Engine damage that can result in sudden stall at speed and/or engine fire as a result of, according to Hyundai, leaking, defective oil pan seals and defective oil pressure switch. | 120,000+ |

20. Over 375,000 2012-2016 model year Kia Soul vehicles equipped with the 1.6-liter "Gamma" engine are being recalled due to a design defect wherein, according to Kia, the catalytic converter can overheat and become damaged, resulting in abnormal combustion in the engine, damage to the pistons and resulting connecting rod failure. These catastrophic failures can result in sudden stalls during normal driving and engine fires. Kia's proposed recall and

repair involves changing the catalytic converter software to a reprogrammed version used beginning in the 2017 model year. On information and belief, the root cause of this problem may actually be metal shavings either left in the engine during manufacturing or resulting from lubrication failures, which then foul the catalytic converter and result in overheating, engine damage, stalls, or fires. This would be consistent with the failures in vehicles with related engines that were previously recalled.

21. The catalytic converter overheating may be related to or caused by metal shavings left in the engine during manufacturing or resulting from lubrication failures due to a design defect, but the result would be the same: engine wear and damage over time that can result in sudden stalls during normal operation, destruction of the engine, and fires. Specifically, metal shavings created during the machining process will cause internal destruction if not thoroughly removed from engine blocks prior to assembly. Foreign metal contaminants can foul and obstruct oil and coolant passages, starving the engines of requisite lubrication and cooling fluids.

22. Over 120,000 2011-2013 model year Hyundai Tucson SUVs are being recalled due to a manufacturing defect wherein, due to improper sealing during engine production, oil leaks can lead to engine damage, sudden stalls during normal operation, and/or engine fires. As of the filing of this lawsuit, Hyundai professed not to know—nine years after the first of these vehicles entered production—the cause of this defect. Several months later, Hyundai has proposed a woefully inadequate fix.

23. Finally and surprisingly, Kia has still not recalled 300,000+ Kia Souls equipped with the 2.0-liter "Nu" engine despite numerous reports of similar engine failures, stalls, and fires, such as the ones suffered by Plaintiffs Twigger, Smith, Frazier, and Wight.

24. Hyundai and Kia alike have failed to disclose and/or have concealed these defects for years, despite hundreds of consumer complaints of spontaneous catastrophic engine failures, stalls, and fires; despite prior recalls of closely related engines for similar defects resulting from similar complaints; and despite durability testing that revealed these defects before the Class Vehicles ever entered production. In the case of the Kia Souls with Nu engines, Kia continues to conceal the defects. The recalls now being conducted were forced by a NHTSA investigation that grew in part out of concern over the timeliness and scope of Hyundai's prior recalls for defects that could lead to engine fires in vehicles equipped with similar engines. Congress eventually summoned Kia and Hyundai executives to appear and testify about these defects, but these executives refused to appear.

25. Despite years of knowledge, Hyundai and Kia long failed to provide information to their consumers—consumers unknowingly driving unsafe vehicles that may suddenly stall or burst into flames at any time. Defendants announced in early 2019 that there would be a Tucson recall, nearly nine years after the vehicles entered production, although the announcement did not disclose what the recall would entail. As of August 2019—seven months after the initial announcement that some recall would be forthcoming, and five months after the filing of this lawsuit—concerned consumers still saw only the below graphic if they looked up the recall on Hyundai's recall website:




26. Because of the inherent engine defects and Defendants' concealment of the same, Plaintiffs and other owners and lessees of the Class Vehicles unknowingly assumed the risk of catastrophic engine failures and fires—and concomitant risk of injury or death—resulting from defects that Hyundai and Kia knew about before the vehicles were ever sold; learned about from the hundreds or thousands of engine failures, fires, and complaints from consumers that followed; and concealed and failed to remedy for years.

27. As a result of Defendants' conduct, Plaintiffs and other owners and lessees of the Class Vehicles overpaid at the time of purchase or lease for vehicles that were actually defective, have or will suffer the costs associated with extensive repairs, have owned and leased vehicles that were less valuable than those for which they bargained, and have seen their vehicles likely lose market value. Defendants still have not provided to Plaintiffs the vehicles bargained for, and

even a future repair would not restore purchasers and lessees to the benefits of ownership for which they bargained and that they would have received but for the defect.

## II. PARTIES

### A. Defendants

28. Defendant **Hyundai Motor America, Inc.,** (HMA) is a manufacturer and distributor of new motor vehicles under the Hyundai brand and is incorporated and headquartered in the state of California. Its principal place of business is located at 10550 Talbert Avenue, Fountain Valley, California. HMA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States from its headquarters in California. HMA also creates and distributes the warranties and other written materials that accompany the sale and lease of Hyundai-branded vehicles throughout the United States, and makes decisions concerning warranty coverage of customer vehicles when problems arise.

29. Defendant **Hyundai Motor Company** (HMC) is a multinational auto manufacturer with its headquarters in Seoul, South Korea. HMC controls and operates its subsidiaries in the Hyundai Motor Group, which includes Hyundai Motor America, Inc., as well as Kia Motors Corporation and Kia Motors America, Inc. Activities of the Hyundai Motor Group include the design, manufacture, and testing of the engines and vehicles at issue in this Complaint. Revenue from the distribution and sale of Hyundai-branded vehicles in the United States flows from Hyundai Motor America, Inc., to its corporate parent, Hyundai Motor Company.

30. Defendant **Kia Motors America, Inc.,** (KMA) is a manufacturer and distributor of new motor vehicles under the Kia brand and is incorporated and headquartered in the state of

California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. KMA markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California. KMA also creates and distributes the warranties and other written materials that accompany the sale and lease of Kia-branded vehicles throughout the United States, and makes decisions concerning warranty coverage of customer vehicles when problems arise.

31. Defendant **Kia Motors Corporation** (KMC) is a multinational auto manufacturer with its headquarters in Seoul, South Korea. It is the corporate parent of Kia Motors America, Inc. and is a part of the Hyundai Motor Group. Defendant Hyundai Motor Company has an ownership interest in Kia Motors Corporation. Revenue from the distribution and sale of Kia-branded vehicles in the United States flows from KMA to its corporate parent, KMC.

**B. Plaintiffs**

32. Plaintiff **Linda Short** is a citizen of Washington state who resides in Redmond. She leased a new 2013 Hyundai Tucson equipped with the 2.4-liter "Theta II" engine on or about March 30, 2013, and then purchased the vehicle at the end of the lease from Hyundai of Kirkland in Kirkland, Washington on January 6, 2016, at which time the vehicle was still covered by the manufacturer's warranty. Plaintiff Short's Tucson is a Class Vehicle equipped with the defective engine.

33. Through her exposure and interaction with Hyundai, Plaintiff Short was aware of Hyundai's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Hyundai disclose the engine defect to her.

Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of lease and purchase, Plaintiff would not have leased or purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

34. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the defect and believes that its market value has been diminished as a result of the defect.

35. Plaintiff **Olivia Parker** is a citizen of California who resides in Joshua Tree. In September 2018 she purchased a used 2014 Kia Soul equipped with the 1.6-liter "Gamma" engine, from Palm Springs Kia in Cathedral City, California, for approximately $15,000. Plaintiff Parker's Soul is a Class Vehicle equipped with the defective engine.

36. Through her exposure and interaction with Kia, Plaintiff Parker was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

37. Plaintiff has serviced the vehicle regularly but is now concerned about driving it due to the dangers resulting from the defect and believes that its market value has been diminished as a result of the defect.

38. Plaintiff **Elizabeth Snider** is a citizen of Washington state who resides in Shelton, Washington. In June 2012 she purchased a new 2012 Kia Soul equipped with the 2.0-

liter “Nu” engine from West Hills Kia in Bremerton, Washington, for approximately $21,000. Plaintiff Snider’s Soul is a Class Vehicle equipped with the defective engine.

39. Through her exposure and interaction with Kia, Plaintiff Snider was aware of Kia’s uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

40. Plaintiff has serviced the vehicle regularly but is now concerned about driving it due to the dangers resulting from the defect and believes that its market value has been diminished as a result of the defect.

41. Plaintiffs **Jennifer** and **Anthony DiPardo** are citizens of Pennsylvania who reside in Carnegie, Pennsylvania. The DiPardos purchased a new 2014 Kia Soul equipped with the 2.0-liter “Nu” engine on September 16, 2014, from Baierl Kia in Wexford, Pennsylvania, for approximately $23,000. The DiPardo Plaintiffs’ Soul is a Class Vehicle equipped with the defective engine.

42. Through their exposure and interaction with Kia, the DiPardo Plaintiffs were aware of Kia’s uniform and pervasive marketing message of dependability and safety, which is a primary reason they purchased their Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to them. Had Defendants disclosed the defect and risk of sudden stalling or fire at the time of purchase, Plaintiffs would not

have purchased their vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

43. Plaintiffs worry about driving their vehicle due to the dangers resulting from the defect and believe that its market value has been diminished as a result of the defect.

44. Plaintiff **Seane Ronfeldt** is a citizen of Ohio who resides in Toledo. In November 2016, he purchased a new 2016 Kia Soul equipped with the 1.6-liter “Gamma” engine from Taylor Kia in Toledo, Ohio, for approximately $19,000. Plaintiff Ronfeldt’s Soul is a Class Vehicle equipped with the defective engine.

45. Through his exposure and interaction with Kia, Plaintiff Ronfeldt was aware of Kia’s uniform and pervasive marketing message of dependability and safety, which is a primary reason he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to him. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

46. On Saturday, July 20, 2019, Plaintiff Ronfeldt was driving his Kia Soul at approximately 70 MPH on an interstate highway in Michigan when the engine shuddered and lost all power. He maneuvered the vehicle onto an exit ramp and then, with assistance from other people, pushed it into a nearby parking lot. The vehicle was towed to Kia of Lansing, Michigan, which confirmed that the engine had blown a connecting rod through the engine casing. Kia suggested replacing the engine but refused to do this work under warranty or otherwise compensate Plaintiff Ronfeldt for replacing the engine or any other repairs. Plaintiff had the

vehicle towed back to Toledo, Ohio, at his own expense. Plaintiff Ronfeldt's vehicle experienced symptoms associated with the engine defect at approximately 55,000 miles.

47. Plaintiff Ronfeldt contacted Defendant Kia of America through its website and entered information to request repair of his engine under warranty. Service managers at both Kia of Lansing and Taylor Kia of Toledo informed Plaintiff Ronfeldt that Kia of America would not cover the repairs under warranty or otherwise reimburse the repairs. Plaintiff Ronfeldt's insurance company, however, upon inspection, concluded that the incident was the result of a design or manufacturing defect. Because Plaintiff Ronfeldt concluded that Kia's charges for replacing the engine with a new engine were exorbitant without warranty coverage, and because Plaintiff still owed substantial amounts on the vehicle and relied on it for transportation, he had a local mechanic install a used 1.6-liter "Gamma" engine. Plaintiff services the vehicle regularly but is worried about driving it due to the dangers resulting from the engine defect, especially since he has experienced the engine failure and connecting rod breakage once already—fortunately without a resultant engine fire. He believes that his vehicle's market value has been substantially diminished as a result of the defect and his vehicle's repair and incident history.

48. Plaintiff **James Michael Twigger** is a citizen of West Virginia who resides in Charleston, West Virginia. In July 2014, he purchased a new 2014 Kia Soul Plus equipped with the 2.0-liter "Nu" engine for approximately $19,500 from Dutch Miller Kia of South Charleston, West Virginia. Plaintiff Twigger's Soul is a Class Vehicle and equipped with a defective engine.

49. Through his exposure and interaction with Kia, Plaintiff Twigger was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to him. Had Defendants

disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

50. On July 1, 2017, while driving on I-64, a major highway, his vehicle's engine spontaneously stopped working, so he moved the car to the shoulder of the highway. Moments later, the engine started smoking, ignited into flames, and burned, destroying the vehicle:






51. The vehicle was declared a total loss by his insurer:





52. Upon information and belief, the fire was caused by an engine defect that resulted in a connecting rod failure that led to a hole in his engine block through which oil leaked, ultimately touching hot engine components and sparking this destructive fire. Plaintiff Twigger's vehicle experienced symptoms associated with the engine defect. The failure occurred at 118,349 miles.

53. Plaintiff **Gabrielle Alexander** is a citizen of Arizona who resides in Fountain Hills, Arizona. In June 2016, she purchased a new 2016 Kia Soul equipped with the 2.0-liter "Nu" engine for approximately $22,065 from Garden Grove Kia in Garden Grove, California. Plaintiff Alexander's Soul is a Class Vehicle equipped with the defective engine.

54. Through her exposure and interaction with Hyundai, Plaintiff Alexander was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a

primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

55. Plaintiff **Tavish Carduff** is a citizen of Missouri who resides in Kansas City, Missouri. In May 2014, she purchased a new 2014 Kia Soul equipped with the 2.0-liter "Nu" engine for approximately $21,000 from Oakes Kia in Kansas City, Missouri. Plaintiff Carduff's Soul is a Class Vehicle equipped with the defective engine.

56. Through her exposure and interaction with Kia, Plaintiff Carduff was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her.

57. In October 2019, Plaintiff's vehicle suffered a catastrophic engine failure while driving in rush hour traffic. The vehicle had approximately 106,000 miles at the time of the failure. Plaintiff paid out of pocket for a tow to Oakes Kia for repair, where the service department informed her that the vehicle required a new engine and catalytic converter to be drivable. Plaintiff Carduff's vehicle experienced symptoms associated with the engine defect.

58. The quoted cost of the engine replacement was $8300, and the catalytic converter was $1300. KMA offered to pay for $3000 toward the engine replacement, but only if Ms. Carduff and her husband signed a broad release of all potential legal claims. Plaintiff Carduff refused to sign the release and has paid $9,712.94 out of pocket for these repairs to date.

59. Before the failure, Plaintiff had repeatedly voiced concerns that the vehicle was running roughly and was making odd noises from the engine bay, but dealership staff was unable or unwilling to diagnose a problem, despite multiple visits.

60. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

61. Plaintiff **Brian Frazier** is a citizen of Connecticut and resides in Killingley, Connecticut. Plaintiff Frazier purchased his Class Vehicle used from Courtesy Ford in Killingley, Connecticut in February 2016 with an odometer reading of 73,936 miles. Plaintiff Frazier's 2014 Soul, for which he paid for approximately $12,070, is a Class Vehicle equipped with the defective 2.0-liter "Nu" engine.

62. Prior to purchasing his Class Vehicle, Plaintiff Frazier reviewed Kia's televised and website promotional materials without Kia disclosing the engine defect.

63. Through his exposure and interaction with Kia, Plaintiff Frazier was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to him.

64. In August 2019, at approximately 103,200 miles, Plaintiff Frazier's 2014 Soul, while operating in intended and foreseeable circumstances, suffered catastrophic internal engine component failure that punctured a hole in the engine's block, caught fire and burned completely. A wrecker service towed Plaintiff Frazier's vehicle to a salvage yard. The 2014 Soul was rendered a total loss and a fire investigator concluded the fire originated at the engine.

Plaintiff Frazier submitted a written request for reimbursement to KMA, which declined to compensate Frazier or acknowledge fault.

65. Plaintiff Frazier did not receive the benefit of his bargain. He purchased a vehicle of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.

66. Had Kia disclosed the engine defect, Plaintiff Frazier would not have purchased his Class Vehicle, or certainly would have paid less to do so.



67. Plaintiff **Chad Perry** is a citizen of California who resides in Helendale, California. In September 2019, he purchased a used 2014 Kia Soul equipped with the 2.0-liter "Nu" engine for approximately $22,285 from Valley Hi Kia in Victorville, California. Plaintiff Perry's Soul is a Class Vehicle equipped with the defective engine.

68. Through his exposure and interaction with Kia, Plaintiff Perry was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason

he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to him. Had Defendants disclosed the safety-related defect and risk of fire or stalling at the time of purchase, Plaintiff would not have purchased the vehicle or would have paid considerably less for it. In fact, Defendants continue to conceal the truth about the engine defect to this day.

69. In April 2020, with fewer than 81,000 miles on the odometer, oil consumption tests on the Soul determined that it needed a new engine. Plaintiff Perry's vehicle experienced symptoms associated with the engine defect.

70. Plaintiff **William Pressley** is a citizen of North Carolina and resides in Charlotte, North Carolina. Plaintiff Pressley purchased his Class Vehicle used from Hertz Car Sales in Charlotte, North Carolina in August 2016 with an odometer reading of 45,079 miles. Plaintiff Pressley's 2015 Soul, for which he paid for approximately $13,455, is a Class Vehicle equipped with the defective 2.0-liter "Nu" engine.

71. Prior to purchasing his Class Vehicle, Plaintiff Pressley reviewed Kia's televised and website promotional materials without Kia disclosing the engine defect.

72. Through his exposure and interaction with Kia, Plaintiff Pressley was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason he purchased his Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to him. In fact, Defendants continue to conceal the truth about the engine defect to this day.

73. In July 2019, at approximately 84,790 miles, Plaintiff Pressley's 2015 Soul, while operating in intended and foreseeable conditions, suffered catastrophic internal engine component failure that punctured a hole in the engine's block. A wrecker service towed Plaintiff

Pressley's vehicle to Dutch Kia in Charlotte, North Carolina, which examined the engine and diagnosed total rotating component and block failure and quoted a replacement engine cost of approximately $10,000. Kia offered Plaintiff Pressley no assistance in terms of goodwill warranty repair or discounted engine replacement. Plaintiff Pressley's vehicle experienced symptoms associated with the engine defect.

74. Mr. Pressley declined Dutch Kia's engine replacement bid and in August 2019 had the vehicle towed to Brake and Alignment Center, an independent repair shop in Charlotte, North Carolina. Brake and Alignment Center removed the destroyed factory engine and installed a used 2.0-liter "Nu" replacement engine for approximately $5,729.00.

75. Plaintiff Pressley did not receive the benefit of his bargain. He purchased a vehicle of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The engine defect has significantly diminished the value of Plaintiff Pressley's Class Vehicle.

76. Had Kia disclosed the engine defect, Plaintiff Pressley would not have purchased his Class Vehicle, or certainly would have paid less to do so.

77. Plaintiff **Jeanett Smith** is a citizen of Texas and resides in Rowlett, Texas. Plaintiff Smith purchased her Class Vehicle used from Southwest Kia in Rockwall, Texas, in February 2013 with an odometer reading of approximately 48,000 miles. Plaintiff Smith's 2012 Soul, for which she paid for approximately $27,250, is a Class Vehicle equipped with the defective 2.0-liter "Nu" engine.

78. Prior to purchasing her Class Vehicle, Plaintiff Smith reviewed Kia's televised, website and hard copy promotional materials without Kia disclosing the engine defect.

79. Through her exposure and interaction with Kia, Plaintiff Smith was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her. In fact, Defendants continue to conceal the truth about the engine defect to this day.

80. In December 2016, at approximately 105,559 miles, Plaintiff Smith's 2012 Soul, while operating in intended and foreseeable conditions, suffered catastrophic internal engine component failure that resulted in an engine fire that consumed the entire vehicle within moments. Plaintiff Smith's vehicle was rendered a total loss.





81. Kia offered Plaintiff Smith no compensation for the loss of her vehicle. Plaintiff Smith's vehicle experienced symptoms associated with the engine defect.

82. Plaintiff Smith did not receive the benefit of her bargain. She purchased a vehicle of lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The engine defect has significantly diminished the value of Plaintiff Smith's Class Vehicle.

83. Had Kia disclosed the engine defect, Plaintiff Smith would not have purchased her Class Vehicle, or certainly would have paid less to do so.

84. Plaintiff **Janell Wight** is a citizen of Washington who resides in Lakebay, Washington. In December 2015, she purchased a new 2016 Kia Soul equipped with the 2.0-liter "Nu" engine from Car Pros Kia in Tacoma, Washington, for approximately $24,000.

85. Through her exposure and interaction with Kia, Plaintiff Wight was aware of Kia's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles, at no point did Kia disclose the engine defect to her. In fact, Defendants continue to conceal the truth about the engine defect to this day.

86. On January 31, 2020, while driving on State Route 16 in Gig Harbor, Washington, her vehicle lost power and began making a grinding noise. She moved the car to the shoulder of the highway. Moments later, the engine started smoking, ignited into flames, and burned, destroying the vehicle. Plaintiff Wight's vehicle experienced symptoms associated with the engine defect. The failure occurred with fewer than 50,000 miles.



## III. JURISDICTION AND VENUE

87. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), because the putative class numbers more than 100, the aggregate amount in controversy exceeds $5,000,000 excluding costs and interest, and at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

88. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, and sold the affected vehicles, including those owned by Plaintiffs Short, Snider, and Wight, and otherwise conducted extensive business within this District.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

89. Defendants Hyundai Motors Company, Hyundai Motor America, Kia Motors Corporation, and Kia Motors America Inc. worked together for years to design, test, manufacture, market, and distribute vehicles with defective engines ("Class Vehicles") and then concealed the defects, failing to disclose the true nature of the engines and vehicles to consumers, who—unbeknownst to them—were driving vehicles that had serious safety-related defects because they could stall at any moment and/or burst into flames.

90. The following chart summarizes the defects and the symptoms:

| Model Years | Model and Defective Engine | Likely or Reported Safety-Related Defect(s) | Number of Affected Vehicles |
|---|---|---|---|
| 2012-2016 | Kia Soul 1.6-liter "Gamma" | Engine suddenly stalling at speed and bursting into flame because, according to Kia, the catalytic converter is susceptible to | 378,967 |

| | | | |
|---|---|---|---|
| | | overheating, ultimately causing connecting rods to fracture engine block. | |
| 2012-2016 | Kia Soul 2.0-liter "Nu" | Engine suddenly stalling at speed and bursting into flame when connecting rods fracture engine block due to catalytic converter susceptible to overheating, debris left in engine during manufacturing, and/or oil starvation and lubrication failure. | 300,000+ |
| 2011-2013 | Hyundai Tucson 2.0-liter "Theta II" | Engine damage that can result in sudden stall at speed and/or engine fire as a result of, according to Hyundai, eaking, defective oil pan seals and defective oil pressure switch. | 120,000+ |

91. At the latest, Hyundai knew by the end of June 2013 that the engines in the Tucson Class Vehicles were defective and presented a safety hazard, and by the end of May 2012, Kia knew the engines in the Soul Class Vehicles were defective and presented a safety hazard.[8] This is based on the NHTSA complaints filed specifically related to the Class Vehicles, warranty claims made by customers through dealers reported therein, the NHTSA complaints Defendants reviewed (as required by the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000)), piecemeal recalls they issued for vehicles with identical engines and problems, and, finally, Kia's development of a partial fix for the 1.6-liter Soul before the 2017 model year. Had Defendants disclosed the true nature of the Class Vehicles and their defective engines, Plaintiffs

[8] These dates are based only on publicly available information, without the benefit of discovery. Plaintiffs believe that discovery will confirm their independent information and belief that durability testing and defects reported in other vehicles meant Defendants were well aware of the defects in these engines before these NHTSA complaints and warranty claims surfaced and before the earliest Class Vehicles were sold or leased to Plaintiffs and putative Class members.

either would not have purchased the Class Vehicles or would have paid significantly less for them. When Defendants finally acknowledged these defects in 2019—but only for the 1.6-liter Soul and the Tucson Class Vehicles, not the 2.0-liter Soul—they proposed only inadequate recalls that neither fully remedy the defects nor compensate Plaintiffs and class members. In fact, to this day, Defendants still have not acknowledged or disclosed the true nature of the engine defect plaguing the Class Vehicles.

### 1. 2011-2013 Hyundai Tucson 2.4-liter and 2012-2016 Kia Soul 1.6- and 2.0-liter Engines Have Serious Safety-Related Defects.

#### a. 2012-2016 Kia Soul 1.6-liter "Gamma" engines suffer from safety-related defects that can result in catastrophic failures, stalls, and engine fires.

92. In February 2019, Kia Motors America, Inc. (KMA) issued a recall for 378,967 **Soul** vehicles from the 2012 to 2016 model years, all of which have 1.6-liter direct injection gasoline engines. According to Kia's recall notice, the catalytic converter in these engines, which reduces pollutants in exhaust emissions, is susceptible to overheating due to a programming error. When the catalytic converter overheats, abnormal combustion in the engine can result. This can damage the pistons' connecting rods, potentially fracturing the engine block and causing an oil leak. Connecting rod failure, damaged pistons, and a cracked engine block can all cause sudden and catastrophic engine failure during normal driving, and the resulting leakage of oil onto hot engine parts can result in engine fires.[9]

93. The catalytic converter overheating likely plays a role in the failure mode of these engines, but on information on belief, that overheating, along with the eventual connecting rod

---

[9] Letter to Mr. J.S. Park: Overheated Catalytic Converter May Damage Engine for NHTSA Recall No. 19V120000 (Feb. 27, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCAK-19V120-4114.pdf (last visited April 29, 2019).

failure and other damages, is caused by problems that run deeper. On information and belief, these engines suffer from the same types of contamination with metal shavings—either left in the engine during manufacturing and/or introduced by insufficient lubrication during operation—as the other related engines that the Defendants have previously recalled. This contamination may cause fouling of the catalytic converter, which is not designed to—and should not need to—handle these additional contaminants, which in turn leads to overheating of the catalytic converter.

94. Metal shavings created during the casting process must be thoroughly removed to prevent damage in the field. If left in the engine blocks, metal shavings will blend with engine oil, interfering with the fluids' lubrication and heat exchange functions. Specifically, metal shavings left in oil passages can blend with engine oil, accumulate and block oil passages, starving the rotating components of lubricating oil and causing excessive heat and excessive metal on metal friction. The metal shavings can also wedge themselves between closely positioned rotating components, gouging the surfaces and causing reduced oil pressure, oil consumption and resultant oil starvation. Oil starvation leads to internal component destruction and invites engine block destruction/puncture and oil and coolant escape fires.

95. Metal shavings left in coolant passages must also be thoroughly removed. If not removed, they can blend with engine coolant, accumulate and block coolant passages, starving the entire engine of required heat exchange and lubricating fluid, causing engine component overheating, swelling, and resultant excessive metal on metal friction. Coolant starvation and inadequate heat exchange leads to internal component destruction and invites engine block destruction/puncture and oil and coolant escape fires.

96. On November 16, 2018, KMA and Kia Motors Corporation (KMC), (collectively Kia) submitted a response to Defect Petition (DP18-003) for the Kia Soul vehicle and did not identify or report any potential defect trends. Between November 16 and December 5, 2018, KMC analyzed Soul engine claim data and identified a relationship between catalytic converter damage and engine fires. Upon KMC's request, KMA collected data throughout December for an evaluation of defect trends in suspect vehicles. Between January 7 and February 20, 2019, KMC engineers traveled to the United States to inspect 120 collected, potentially hazardous parts. They identified the defect and confirmed the risk of sudden engine stalls and fires. More than three months after Kia's investigation began, KMC decided to conduct a safety recall due to potential risk of fire on February 21, 2019.[10]

97. This investigation and recall amount to too little, too late. Kia was aware of the dangerous defects in Gamma engines as early as 2011 and has used reprogrammed logic to operate the catalytic converters since the 2017 model year. The Safety Recall Report for the February 21, 2019 recall discloses that "[t]he [Electronic Control Unit] ECU logic for the Catalytic Overheating Protection (COP) was changed and improved to prevent overheating of the catalytic converter on July 27, 2016, beginning with the start of the 2017 MY Soul production. However, the 2016 MY Soul production ended on August 11, 2016 with the previous COP ECU logic."[11]

---

[10] 2012-2016 MY Soul Engine Control Unit (ECU) Logic Chronology for NHTSA Recall No. 19V-120 (Feb. 22, 2019), https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V120-6176.pdf (last visited April 29, 2019).

[11] Part 573 Safety Recall Report for NHTSA Recall No. 19V-120 (Feb. 22, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V120-1711.PDF (last visited April 29, 2019).

98. In April 2019, Kia provided a service bulletin to dealer service departments concerning the procedure for the proposed recall.[12] This document explains the defect as follows:

> Under certain conditions, the catalytic converter may become damaged due to overheating caused by an excessive increase of exhaust gas temperatures. If the catalytic converter is damaged, substrate particles can enter the engine combustion chamber and cause abnormal engine combustion. Continuous abnormal engine combustion can result in damage to one or more of the engine's pistons which can cause piston rod breakage, potentially puncturing the engine block allowing engine oil to escape. Engine oil that contacts a hot exhaust surface may result in a fire.

The service bulletin instructs the service department to check diagnostic codes stored in the vehicle's onboard diagnostic system and, depending on what diagnostic codes are present, do one of three things: reprogram the ECU (euphemistically called "perform ECU logic improvement" in the service bulletin), replace the catalytic converter and then reprogram the ECU, or perform a compression test on the engine. If the engine passes the compression test, the catalytic converter is replaced and the ECU reprogrammed. If it fails, the entire engine short block and numerous additional engine components are to be replaced, along with the catalytic converter and the ECU reflash. The following flow chart was provided in the service bulletin[13]:

[12] Safety Recall Campaign SC176 Remedy Instructions and Technical Service Bulletin (April 2019), https://static.nhtsa.gov/odi/rcl/2019/RCRIT-19V120-5381.pdf (last visited April 29, 2019).

[13] *Id.*




99. There are several problems with this proposed recall, all of which will likely take time and expense to resolve, if the problems are even resolvable. One problem is that it is not clear that the ECU reflash complies with state and federal emissions regulations because it is not the emissions-related programming with which the vehicle was originally certified for emissions compliance. It will likely take time and money for Defendants to get the ECU reflash compliant and certified. Another problem is that the bulletin indicates that Kia expects that some engines will have already experienced damage serious enough to require engine block replacement, and plans to replace the defective parts with new, undamaged stock of the same defective parts. Kia's and Hyundai's history with related engines leads Plaintiffs to question whether replacing damaged parts with newer undamaged parts of the same design will solve anything beyond the very short term. Kia and Hyundai have previously recalled over 2 million vehicles due to risk of similar engine failures and fires. Among these, numerous engines were replaced only to experience similar failures again because the replacements were also defective. This further raises the question of whether the source of the fires really is the catalytic converter, rather than an engine design or manufacturing defect similar to those experienced by owners and lessees of other vehicles.

100. While improved catalytic converter programming may reduce the incidence of overheating in the catalytic converter, it will not solve the underlying defects of design and manufacturing, in effect potentially remedying one symptom and strengthening one failure point but not solving the problem permanently and not before numerous consumers suffered engine failures and fires.

101. Rather than Defendants' proposed piecemeal approach of merely replacing damaged parts with parts that are also defective, Plaintiffs would rather their vehicles receive new, non-defective engines. To develop such engines, or to determine how such engines would be integrated within older model cars like Class Plaintiffs', would likely take considerable time and money, while Plaintiffs and Class members would still be stuck driving dangerously defective vehicles. If Defendants cannot provide engines that do not contain defective parts, they should buy the Class Vehicles back.

**b. 2012-2016 Kia Soul 2.0-liter "Nu" engines also suffer from safety-related defects that can result in catastrophic failures, stalls, and engine fires.**

102. Like the 1.6-liter Kia Soul and numerous other Kia models before it, on information and belief, the 2.0-liter version suffers from a defect or defects that can result in catastrophic failures, stalls, and engine fires.

103. For the 2012-2016 model years, Kia sold at least 300,000 2.0-liter Souls in the United States.

104. Kia's prior recalls involve manufacturing and design defects that result in oil starvation or lubrication failures, or from metal debris left in the engine during manufacturing. When these conditions occur, the connecting rods between the engine pistons and crankshaft can eventually fail and puncture the engine block. When this occurs, engine oil or uncombusted fuel

can leak out of the punctured engine block, contact hot engine components, and ignite engine fires. Even if the engine block is not punctured, connecting rod and rod bearing failures can result in sudden, catastrophic engine failures or stalls at speed, which can be just as dangerous as an engine fire. Kia's proposed recall blames an overheating catalytic converter for this type of failure in the 1.6-liter engines, and in the past Kia and Hyundai have blamed manufacturing problems with oil seals or with metal debris left in engine components for this type of failure in prior recalls of 2.0- and 2.4-liter engines.

105. On information and belief, and as demonstrated by the experiences of Plaintiff Twigger and other class members whose 2.0-liter Kia Souls have suffered engine failures and fires, these vehicles, too, suffer from a dangerous defect similar in type and result to the defects in the 1.6-liter Soul and/or the 2.0- and 2.4-liter engines previously recalled in other models. However, Kia has failed to announce any recall or repair for these vehicles.

**c. 2011-2013 Hyundai Tucsons 2.4-liter "Theta II" engines suffer from safety-related defects that can result in catastrophic failures, stalls, and engine fires.**

106. Manufacturing defects leading to oil pan leaks in 2011-2013 Hyundai Tucson vehicles have caused serious risk of harm in the form of spontaneous engine stalling and engine fire.

107. Alongside the Kia Soul 1.6-liter recall described above, Hyundai issued a recall of at least 120,000 Tucson SUVs from the 2011 to 2013 model years due to potential engine pan oil leaks caused by insufficient sealing between the oil pan and the engine block.[14] If unaddressed,

[14] Part 573 Safety Recall Report for NHTSA Recall No. 19V063000 (Feb. 15, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V063-6813.PDF (last visited Mar. 2, 2019).

the engine oil pan leakage may cause engine damage that leads to increased risk of fire or a stalled engine at high speeds.

108. Two Hyundai Tucson Safety Recall Reports were submitted on February 5, 2019 and February 15, 2019. Both reports identified that vehicles produced from March 1, 2010, to December 31, 2012, needed to be recalled for safety purposes, but the later Safety Recall Report specified that potentially hazardous Tucson vehicles were equipped with 2.4-liter "Theta II" engines—the same engine involved in 2015 and 2017 recalls of other vehicles for engine fire defects, some of which were recalled yet again in 2019 because the fires could recur even after recall repairs were conducted. Based on information NHTSA received from HMC, the recall of Tucson vehicles was required to minimize exposure to risk of stalling or fire.[15]

109. Despite the fact that this dangerous defect persists in vehicles manufactured as long ago as 2010, and despite several failed recalls of other models equipped with the same and related engines over the past several years, as of March 2019 Hyundai *still* had not identified the cause of the defect or proposed a repair for it, merely announcing that there will be some form of recall for the 2011-2013 Tucson. Unlike owners of other models with the same defective engine, owners of these vehicles, like Plaintiff Short, have been driving them for up to nine years with a risk of sudden stalls or fires that was known to Hyundai. Hyundai's interim notice to owners—received by Plaintiff Short in April 2019 for her 2013 model year Tucson—refers to the defect as an "important safety matter" but does not provide any solution or any timeline for a recall, and merely thanks owners for their patience as if they had any choice.

---

[15] Part 573 Safety Recall Report for NHTSA Recall No. 19V063000 (Feb. 5, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V063-6690.PDF (last visited Mar. 2, 2019); *Id.*

110. In July 2019, Hyundai finally released a service bulletin for this recall, and planned to begin informing owners in August. Like its previous recalls for fire-related defects in GDI engines, the bulletin demonstrates that this repair is unlikely to permanently solve the problem and does nothing to compensate owners who have driven dangerously defective vehicles for years. The TSB confirms the nature and seriousness of the defect:[16]

> **Description:** Certain 2011-2013 MY Tucson vehicles equipped with 2.4L engines may have an engine oil leak from the seal between the oil pan and engine block which, if left unrepaired and operated over time, could eventually lead to engine damage. A damaged engine could lead to a high-speed stall and, in limited cases, a vehicle fire. This bulletin describes the procedure to install an updated oil pressure switch and, if necessary based on vehicle inspection, an oil pan.

111. The proposed repair consists of inspecting the oil pan for evidence of previous leaks—leaks which, as the TSB states, could have already resulted in engine damage while the vehicle was operated in the six to nine years since it was sold new—and, if and only if evidence of previous leaks appears, replacing and resealing the oil pan. By definition, because Hyundai failed to issue any recall or service bulletin in the six to nine years since these vehicles were sold new, any vehicle with oil leaks has been "left unrepaired and operated over time," the circumstances under which the TSB confirms that engine damage could occur and result in a "high-speed stall" or "vehicle fire." There is no provision in the recall for inspecting the engine for damage. Nor is there any provision for resealing or replacing oil pans on vehicles on which evidence of oil leakage is not visible, such as if the vehicle's undercarriage has been recently cleaned or sprayed with rust protectant—both common practices. The TSB also calls for replacing the oil pressure switch with a new design, indicating both that the previous design was

---

[16] Hyundai TSB 19-01-012H, July 2019.

defective in that it did nothing to prevent engine damage and that Hyundai perceives a continuing risk of oil leakage that could cause engine damage.

112. All told, this recall is far too little, far too late, and because it comes so late and fails to address any existing engine damage resulting from the defect, it does nothing to prevent stalls and fires in any Tucson that has already suffered an oil leak as a result of the defect. It also fails to prevent leakage and damage in any vehicle that does not present visible evidence of prior leakage at the time of inspection—*i.e.*, any vehicle that has been thoroughly cleaned or recently treated with rust protectant, as is common in much of the United States. At a minimum, Hyundai should replace and reseal the oil pan on every Tucson, inspect every engine, and replace any engine that shows signs of damage due to oil starvation, or else buy back the vehicles. The recall also fails to provide any warranty coverage for future failures that result from damage accrued over the past six to nine years. As Plaintiff Ronfeldt experienced when his Soul threw a rod, Hyundai and Kia have a history of refusing warranty coverage for catastrophic failures resulting from defects they knew about.

**2. Hyundai and Kia Have Long Experience With Defects In Related Engines That Can Result in Engine Failure and Fires.**

113. Hyundai and Kia are familiar with engine defects and have a track record of failing to adequately remedy them.[17] This is the first time that the Class Vehicles have been subject to recalls for engine defects that could result in stalls or fires, but the companies have previously recalled other vehicles with GDI engines for similar defects.

---

[17] *See, e.g.*, Erza Dyer, *How Kia Got Good*, PopularMechanics.com (Jan. 4, 2018), https://www.popularmechanics.com/cars/car-technology/a14416136/how-kia-got-good/ (last visited Aug. 19, 2019) (noting that Kia Sportage engines were "always blowing up," providing a "lucrative side job" to one mechanic, working to "keep . . . Kias on the road").

114. One such recall was in September 2015, after prompting by the NHTSA. Hyundai issued Recall No. 15V568000 for 470,000 MY 2011-2012 Hyundai Sonata vehicles manufactured at Hyundai Motor Manufacturing Alabama that were equipped with 2.0-liter and 2.4-liter "Theta II" GDI engines due to reported stalling events and numerous engine-related warranty claims.[18] At the time, Kia did not recall any vehicles, though some shared the same "Theta II" engines.

115. The defect and its consequences were described in NHTSA's Safety Recall Report from September 2015 as follows:

> Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period. As part of the machining processes, the engine crankshaft is cleaned to remove metallic debris. If the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings. Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases. A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.[19]

116. In a now-familiar pattern, Hyundai did not recall nearly enough vehicles. In March 2017, Hyundai expanded its initial recall to 572,000 MY 2013-2014 Sonata and Santa Fe Sport vehicles with 2.0-liter and 2.4-liter GDI "Theta II" engines for the same manufacturing debris-related issues, describing the defect as follows:

---

[18] Part 573 Safety Recall Report Chronology for NHTSA Recall No. 15V568000, (Sept. 10, 2015), https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Mar. 1, 2019), at 2.

[19] *Id.* at 1.

> The subject engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the oil pressure lamp in the instrument panel. Over time, the bearing may fail and the vehicle could lose motive power while in motion.[20]

117. That same day, Kia recalled 618,000 MY 2011-2014 Optima, 2012-2014 Sorento and 2011-2013 Sportage vehicles, all of which had the "Theta II" engine as well.[21] Just like Hyundai's recall, the potentially restricted oil flow to the main bearings could lead to premature bearing wear and eventual bearing failure, causing the engine to stall.

> Metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft which may not have been completely removed from the crankshaft's oil passages during the cleaning process. In addition, the machining processes of the crankpins caused an uneven surface roughness. As a result, the metal debris and uneven surface roughness can restrict oil flow to the bearings, thereby increasing bearing temperatures causing premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the engine warning lamp and/or oil pressure lamp in the instrument panel. If the warnings are ignored and the vehicle is continued to be driven, the bearing may fail and the vehicle could stall while in motion.[22]

118. The delay in expanding the recall to all affected vehicles between 2015 and 2017 caught the attention of NHTSA, which launched an investigation in May of 2017 into concerns that both companies' recalls should have been issued earlier. Nearly two more years went by as Hyundai and Kia kept receiving reports of engine fires in vehicles containing Theta II engines.

---

[20] Part 573 Safety Recall Report for NHTSA Recall No. 17V226000 (Mar. 31, 2017), available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 1, 2019), at 1.

[21] David Shepardson, *Kia, Hyundai expand U.S. engine fire recalls by 534,000 vehicles*, Reuters (Feb. 28, 2019), https://www.reuters.com/article/us-kia-motors-recall/kia-hyundai-expand-u-s-engine-fire-recalls-by-534000-vehicles-idUSKCN1QH2EB (last visited Mar. 1, 2019).

[22] Part 573 Safety Recall Report for NHTSA Recall No. 17V224000 (Mar. 31, 2017) available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V224-2355.PDF (last visited Mar. 1, 2019), at 2.

119. While NHTSA was investigating the "timeliness and scope" of the March 2017 Sonata and Santa Fe engine recalls, it relayed to Hyundai that there had been a number of engine-stall and spontaneous fire claims for the Tucson equipped with GDI engines. This investigation, presumably, eventually led to the recall of the 2011-2013 Hyundai Tucson at issue here.[23]

120. In January 2019, Hyundai recalled 100,000 2011-2014 Sonata and 2013-2014 Santa Fe Sport vehicles, and Kia recalled 68,000 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles.[24] These vehicles had already been involved in an earlier recall that could include engine replacement, but fires could recur despite that purported repair. Hyundai has previously repaired cars with similar defects, only to have the problems recur either because the replacement parts suffered from the same defects or because other parts were damaged by the repair process. Consumers whose Class Vehicles are just now being recalled for the first time therefore have reason to worry that merely recalling and repairing these vehicles may not solve these serious and dangerous safety-related defects.

### 3. Defendants Knew About Defects in the Class Vehicles Before Any Named Plaintiff Purchased a Class Vehicle, But Consistently and Actively Concealed Them.

121. Defendants have known about these defects for several years but have consistently and actively concealed them from consumers, including Plaintiffs. They knew about these defects for three reasons: first, their design and durability testing of the engines revealed

---

[23] Andrew Krok, *Hyundai, Kia recall 500,000 cars over fire concerns,* CNet (Feb. 28, 2019), https://www.cnet.com/roadshow/news/hyundai-kia-recall-500000-cars-fire-concerns/ (last visited Mar. 1, 2019).

[24] Andrew Krok, *Hyundai adds 100,000 cars to Kia's engine-fire recall*, CNet (January 17, 2019), https://www.cnet.com/roadshow/news/hyundai-recall-engine-fire-kia/ (last visited Mar. 4, 2019); Andrew Krok, *Kia Optima, Sorento, Sportage recalled a second time for fire risks*, CNet (January 16, 2019, https://www.cnet.com/news/kia-optima-sorento-sportage-recall-fire-risks/ (last visited Mar. 4, 2019).

the existence of the defects; second, customers began filing NHTSA complaints and seeking warranty repairs for different models with the same engines as those in the Class Vehicles even earlier, potentially before the Class Vehicles went on sale, including the 2010 and 2011 Soul; and third, as early as May 2012 for the Soul and June 2013 for the Tucson, customers began experiencing engine failures and fires in the Class Vehicles and filing NHTSA complaints or seeking warranty repairs. But Defendants did not disclose any of the defects and have done nothing but conceal them until very recently. Additionally, even though Defendants recalled those other vehicles, the recalls themselves were inadequate, leading to additional litigation and prompting in part the NHTSA investigation that led to the piecemeal, inadequate proposed recalls at issue here.

**a. Pre-sale Durability Testing Revealed These Defects.**

122. Before vehicles are certified and offered for sale in the United States, they are supposed to undergo rigorous durability testing in order to identify defects such as these. Defendants are required to do this testing for each vehicle model and model year to be sold in the United States.

123. Hyundai and Kia have long touted the joint-testing facility they maintain in California, known as the "Proving Grounds."[25] Opened in 2005, the Proving Grounds—a $60 million facility—was designed as a "test site for the next-generation Hyundai and Kia vehicles," "reaffirm[ing] the compan[ies'] commitment to designing, testing, and building [Hyundai and

---

[25] Kim Dong-Jin, Vice Chairman of Hyundai Motor Company Local Officials Celebrate the Innovative Proving Ground (Jan. 26, 2005), https://www.hyundainews.com/en-us/releases/393 (last visited Aug. 19, 2019).

Kia] products in the United States for North American Consumers."[26] Commentators have also noted the thorough nature of tests conducted at the Proving Grounds, with one such commentator calling them a "searing torture test."[27] Hyundai itself has been touting the Proving Grounds in support of its supposedly thorough testing procedures since as far back as January 2013, claiming things like, "All our testing means it's ready for all of yours"[28]:



**All of our testing means it's ready for all of yours.**

Our California Proving Grounds is a tough place. We leave parts out in the sun for years on end to make sure they'll stand up to even the most extreme heat. We punish our vehicles over rough terrain, hairpin turns and pothole-riddled highways. We simulate America's most demanding driving conditions, over and over and over again. We do all this until we're completely satisfied that every Hyundai is durable, reliable and battle-tested. Then we take what we learn to create some of the safest vehicles on the road. So you can rest assured knowing that your car can handle all the tests you throw at it.

124. Defendants' purportedly rigorous durability testing likely explains why, in January 2013, Hyundai was so comfortable claiming "[t]here's one thing missing from every Hyundai. Worry."[29]

---

[26] *Id.*

[27] Graem Fletcher, *Kia's proving grounds a searing torture test* (Sept. 19, 2013), https://driving.ca/kia/auto-news/news/kias-proving-grounds-a-searing-torture-test-3 (last visited Aug. 19, 2019).

[28] https://www.hyundaiusa.com/new-thinking/quality.aspx, available at https://web.archive.org/web/20130116092630/https://www.hyundaiusa.com/new-thinking/quality.aspx (last visited Aug. 19, 2019).

[29] *Id.*




:

Unfortunately, Plaintiffs and their fellow Class members had a lot to worry about—namely, that their vehicles could stall at speed, and/or burst into flame. These defects should have been caught by Defendants' rigorous testing.

125. Kia's website, press releases, and marketing materials continue to tout "rigorous" testing of both normal and extraordinary driving conditions, over long hours and thousands of miles and in extreme weather and geography, to ensure the durability of Kia vehicles. Kia's website touts its testing: "We put our engines through rigorous testing in the highest, hottest, and coldest places that a car can possibly be before we put them in our cars."[30]

---

[30] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last visited Mar. 4, 2019).




126. Kia's website goes on to describe several specific durability tests it conducts, under the motto "We ruin our cars in various ways, identify causes and find solutions to them to make our cars endure over a long time without fault."[31] These tests include: (1) "item durability tests" of individual parts, (2) "module durability tests" of entire assembled components, (3) a "Belgian road test" of driving over rough cobbles to test noise, vibration, and harshness, (4) a "high speed test," (5) a "corrosion test," (6) a "P/T test" of engine performance and temperature, and (7) whole-vehicle safety/crash testing. It further describes testing for extreme weather conditions as well as durability testing conducted on numerous test facilities around the world.

[31] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last visited March 4, 2019).




127. The tests conducted on the Class Vehicles include long-term durability testing, over many miles (testing "compresses 20-40,000 miles worth of use into a short space of time"[32]) at high speeds, and simulating up to five years of wear and tear.[33] Facility boss Matt Seare described the durability testing as "pretty brutal—like a horror movie for cars."[34]

128. The tests conducted in an attempt to "ruin" test vehicles before selling production vehicles exist precisely to uncover the types of defects at issue. On information and belief, these tests did reveal the presence of metal contamination, oil leaks, and lubrication failures in the Class Vehicles—just like the defects present in related engines—and Defendants failed to

---

[32] Graeme Roberts, *US: Critters count at Hyundai-Kia proving grounds* (July 15, 2014), https://www.just-auto.com/analysis/critters-count-at-hyundai-kia-proving-ground_id148057.aspx (last visited April 29, 2020

[33] *See supra* note 2

[34] *See supra* note 2

remedy the design and manufacturing processes before putting the Class Vehicles into production and then failed to disclose the defects until 2019.

129. Kia therefore knew about these defects before each affected model year ever went to market as a result of its durability testing. But at the very least Kia definitely knew about the problem in at least the 1.6-liter engine and had a partial fix for it by mid-2016 at the latest, and introduced new programming that attempted to remedy at least the catalytic converter portion of the problem for 2017 model year Soul vehicles. Kia's proposed recall repair is to simply reprogram 2012-2016 model year 1.6-liter Souls with the newer programming, which illustrates that between 2016 and 2019, if not beginning before the 2012 model year went on the market, Kia actively concealed its knowledge of this dangerous defect from consumers and safety regulators alike despite hundreds of reports of catastrophic engine failures.

130. Hyundai conducts the same tests as Kia, at the same jointly-operated facilities, and could not fail to notice oil pan leaks in test vehicles. On information and belief, Hyundai, like Kia, detected signs of lubrication failures in durability testing before the Class Vehicles entered the market—as well as similar defects in closely related engines used in other vehicles, which it recalled in the intervening years—but did nothing about the Tucson until 2019.

131. Based on the rigorous testing that Defendants performed on their own accord, Defendants knew about the defects in Class Vehicles well before Plaintiffs and Class members started purchasing them.

**b. NHTSA Reports and Warranty Claims From Consumers Put Defendants on Notice, but Defendants Did Nothing.**

132. Even if Defendants had been ignorant of the problem, the hundreds if not thousands of NHTSA complaints related to Class Vehicles and cars with similar safety-related

defects put Defendants on notice before the Class Vehicles went on sale and, at the very least, before Plaintiffs purchased or leased their vehicles. NHTSA maintains and regularly updates a "consumer complaint automated database" that catalogs consumer complaints related to automotive vehicles. *See Advancing Safety by Addressing Defects and Raising Awareness*, https://www.nhtsa.gov/advancing-safety-addressing-defects-and-raising-awareness (last visited Apr. 27, 2020). It is specifically designed to track and address "safety-related defects." *Id.* This database, which is regularly updated, allows "NHTSA and manufacturers to determine if a safety recall is warranted." *Id.* Accordingly, NHTSA has "[r]egular engagements with Original Equipment Manufacturers (OEMs), including weekly calls with large manufacturers." *Id.* Complaints are also available for download. *See* https://www-odi.nhtsa.dot.gov/downloads/ (last visited Apr. 27, 2020).

133. HMA represents to the public that "Hyundai actively monitors and evaluates potential safety concerns, including non-collision engine fires, with all of our vehicles and acts swiftly to recall any vehicles with safety-related defects … Hyundai quality and safety is among the best in the industry." *See* https://www.cbc.ca/news/business/car-owners-claim-they-were-knowingly-sold-defective-vehicles-1.5073563 (last visited Apr. 28, 2020).

134. Likewise, Kia Defendants represent to the public that they work with NHTSA to "protect U.S. vehicle passengers" and that "[c]laims involving damage to . . . Kia vehicle[s], including fires, are reviewed on a case-by-case basis." *See* https://www.spokesman.com/stories/2019/apr/01/us-safety-agency-opens-probes-into-hyundai-and-kia/ (last visited May 1, 2020); https://www.wesh.com/article/it-kept-blowing-up-another-kia-catches-fire-this-time-in-osceola-county-driveway/27796623# (last visited May 1, 2020).

135. This active monitoring, like most major manufacturers, includes monitoring NHTSA complaints and regularly communicating with NHTSA during the relevant time period, especially when they were engaged in recalling closely related engines in other vehicles. Like other automakers, Defendants regularly review NHTSA complaints because NHTSA complaints represent consumers' experience with potentially warrantable failures that will cost Defendants money; consumer complaints often presage NHTSA investigations and recalls (just as they did here, where the belated and inadequate recalls were triggered by NHTSA's inquiries stemming from consumer complaints about these class vehicles and earlier inadequate recalls); and because NHTSA complaints are public records that often fuel media coverage and consumer perception of automakers' products. Thus, Defendants knew of the NHTSA Complaints.

136. Of course, not every consumer who experiences a problem files a NHTSA complaint—these complaints represent only a sample of consumer experiences. Most consumers will seek repairs at their dealership and make warranty claims to the automakers—if the vehicle is not destroyed by fire, of course—without filing such a complaint. Moreover, for defects that Defendants describe as causing damage only over mileage and time, one would not expect to see numerous complaints soon after the introduction of the Class Vehicles.[35] Taken together, these facts demonstrate the importance of even a relatively small number of NHTSA complaints early on. And even this small sample of complaints demonstrates the severity and dangerousness of the problem: they report vehicles suddenly stalling or seizing at speed, suffering oil starvation and failing destructively, or combusting in flames under normal driving conditions. The first

[35] This also illustrates the importance of durability testing: testing simulates the effects of accrued mileage before production vehicles enter the real world, and does so more quickly than normal driving would accrue them, so that automakers can detect defects and anticipate problems that consumers may experience over time.

complaints of stalls, failures, and fires occurred early in these vehicles' lifespans and, as time passed, the numbers of such complaints grew dramatically.

137. Additionally, warranty claims for engine stalls, failures, and fires put Defendants on notice of the defects. While dealerships provide service and repairs directly to consumers, warranty claims are processed by Hyundai and Kia. Hyundai and Kia therefore knew of the defects as soon as consumers sought repairs for problems attributable to them. While these defects tend to cause worse harm as time goes on, NHTSA complaints include reports by consumers that they sought repairs from their dealers, triggering warranty claims that provided direct notice to Hyundai and Kia of the failures the consumers experienced. The repairs and warranty claims described in NHTSA complaints are, again, a small sample of those processed by Hyundai and Kia, and, on information and belief, those warranty claims put Hyundai and Kia on notice of the defects in the Class Vehicles before any named Plaintiff purchased or leased their vehicle and several years before Hyundai and Kia announced any recalls. Thus, despite both warranty claims and complaints from consumers to the nation's automotive safety regulator, Hyundai and Kia concealed these dangerous defects for years.

**(i) NHTSA Reports Concerning the "Gamma" and "Nu" Engines Used in the Kia Soul**

138. Numerous owners and lessees of 2012-2016 Soul vehicles equipped with both the 1.6-liter and 2.0-liter engines have submitted complaints about catastrophic engine failures and fires to the National Highway Traffic Safety Administration. These complaints go as far back as early 2012—in short, they began almost immediately after the very first 2012 Souls hit the market and before any of the Plaintiffs purchased or leased their vehicles. Many of the complaints are dramatic, discussing engine stalls at high speeds and terrifying fires that drivers

and passengers only narrowly escaped. Numerous complaints also report that the vehicles were taken to dealers for repairs, triggering notification of Defendants and warranty claims decided by Defendants. Defendants therefore learned about these complaints through discussions with NHTSA about serious safety issues, accessing the NHTSA database and reviewing complaints of serious incidents that stand out to anyone concerned with vehicle safety, and learned of failures and fires when they were notified of warranty claims.

139. Defendants, therefore, knew about the defects in each of the affected models soon after they entered the market and before Plaintiffs purchased or leased their vehicles. Examples appear below, and more are appended hereto as Appendix A.

**2012 Kia Soul – NHTSA ID NUMBER: 1045319**

Reported on Mar. 27, 2012 – Incident Date: Mar. 27, 2012

TL* THE CONTACT OWNS A 2012 KIA SOUL. THE CONTACT WAS DRIVING 60 MPH WHEN THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS RESTARTED BUT THE FAILURE RECURRED AS THE CONTACT WAS ATTEMPTING TO DRIVE UPHILL. THE CONTACT TOOK THE VEHICLE TO A DEALER FOR A DIAGNOSTIC TEST. THE DEALER STATED TO THE CONTACT THAT THE VEHICLE NEEDED A SOFTWARE UPDATE. THE FAILURE MILEAGE WAS 600.

**2012 Kia Soul – NHTSA ID NUMBER: 10458979**

Reported on May 18, 2012 – Incident Date May 18, 2012

CAR HAD AN OIL CHANGE AND WAS WASHED THEN CAME HOME. CAR'S FRONT DEFROSTER WAS NOTED TO BE STUCK ON AND WHITE SMOKE STARTED TO BILLOW OUT FROM UNDER THE HOOD. QUICK CHECK UNDER THE CAR NOTED A FLAME THAT WAS EITHER COMING FROM THE CATALYTIC CONVERTER OR REFLECTING IN THE EXHAUST FROM SOMEWHERE ON THE BOTTOM/SIDE OF THE ENGINE. NO FLUIDS WERE SHOWN TO BE LEAKING ONTO THE DRIVEWAY OR WERE VISIBLE. CAR THEN RAPIDLY WENT UP IN FLAMES AND WAS A COMPLETE LOSS. FIRE DEPARTMENT HAD TO PUT OUT. *TR

**2012 Kia Soul – NHTSA ID NUMBER: 10608591**

Reported on July 7, 2014 – Incident Date: June 14, 2013

MY 2012 KIA SOUL CAUGHT FIRE AFTER DRIVING IT FOR APPROXIMATELY 25 MINUTES. THE FIRE STARTED AT THE ENGINE COMPARTMENT AND WAS CONSISTENT WITH A PROBLEM WITH FUEL INJECTION. THE WHOLE CAR BURNED DOWN WITHIN ABOUT 5 MINUTES. *JS

**2012 Kia Soul – NHTSA ID Number: 11128688**

Reported on Sept. 11, 2018 – Incident Date: Sept. 10, 2018

VEHICLE HAS 96000 MILES. WHILE DRIVING ON HIGHWAY BEGAN TO HEAR RATTLING AND PINGING. ATTEMPTED TO MAKE IT TO REST AREA TO PULL OVER AND INSPECT. HEARD LOUD BANG AND ENGINE STALLED. COASTED INTO REST AREA. INSPECTION REVEALED OIL LEAKING FROM HOLE BLOWN IN LOWER ENGINE BLOCK.

**2013 Kia Soul NHTSA ID NUMBER: 10865183**

Reported on May 16, 2016 – Incident Date: Apr. 18, 2016

THE CAR CAUGHT FIRE WITHOUT CAUSE AND EXPLODED ON THE SIDE OF THE ROAD. WE WERE DRIVING DOWN THE HIGHWAY WHEN A CAR COMING THE OTHER DIRECTION FLAGGED US DOWN BECAUSE FLAMES WERE SHOOTING OUT FROM UNDER THE CAR. BY THE TIME I WAS ABLE TO PULL THE CAR OVER FLAMES WERE ENTERING IN THE CABIN AND IT WAS FILLED WITH BLACK SMOKE. THE BRAKES AND ELECTRICAL HAD FAILED SO IT WAS IMPOSSIBLE TO STOP THE CAR. IT EXPLODED 2 MINUTES AFTER WE WERE ABLE TO VACATE THE VEHICLE

**2014 Kia Soul – NHTSA ID NUMBER: 10626163**

Reported on Aug. 18, 2014 – Incident Date: Aug. 17, 2014

WE HAD BEEN DRIVING FOR ABOUT 20 MINUTES. WE PULLED OFF HIGHWAY TO LOOK AT A TOURIST ATTRACTION. NO INDICATION WHATSOEVER THAT ANYTHING WAS WRONG WITH THE CAR. PARKED, TURNED CAR OFF. GOT OUT. GLANCED BACK AT THE CAR AND SMOKE WAS POURING OUT FROM UNDER THE HOOD. SOON THERE WERE FLAMES DRIPPING FROM UNDERNEATH FRONT END (LOOKED LIKE MELTING PLASTIC). CALLED FIRE DEPARTMENT. WITHIN 1 MINUTE FLAMES WERE JUMPING UP ON INTERIOR (DASH AREA) AND EXTERIOR (UNDER HOOD). GOT FIRE EXTINGUISHER FROM NEARBY BUSINESS, BUT WITH HOOD CLOSED, DID NOT HELP. WITHIN 4 MINUTES ENTIRE FRONT END AND FRONT INTERIOR WERE ENGULFED IN

ENORMOUS FLAMES. MANY POPPING NOISES (EXPLOSIONS). FIRE DEPARTMENT ARRIVED AFTER ABOUT 5 MINUTES AND EXTINGUISHED THE FIRE. ENTIRE FRONT END OF CAR MELTED TO THE GROUND. I SHOULD NOTE THAT WHILE WE LEFT THE CAR UNLOCKED WHEN WE GOT OUT, THE DOORS LOCKED THEMSELVES DURING THE FIRE, AND THE KEY FOB WAS INOPERABLE (LOCK ELECTRONICS IN THE CAR WERE FRIED). HAD A PERSON OR PET BEEN IN THE CAR, THEY WOULD HAVE BEEN TRAPPED. MY HUSBAND CUT HIS FACE DURING THIS, BUT DID NOT SEEK A DOCTOR. ALL PERSONAL ITEMS IN THE CAR ARE SEVERELY DAMAGED BY SMOKE. *TR

**2014 Kia Soul – NHTSA ID Number: 11173144**

Reported on Jan. 30, 2019 – Incident Date: Nov. 22, 2017

WHILE DRIVING ON THE HIGHWAY, THE DASH BOARD STARTED TURN OFF AND ON THE CAR BEGAN TO LOSE POWER. I PULLED OFF TO THE SIDE AND THE LIGHTS ON THE DASH CAME ON AND THE CAR SHUT DOWN COMPLETELY.WITHIN A FEW MINUTES SMOKE STARTED COMING FROM THE HOOD OF THE CAR FOLLOWED BY A SMALL FIRE. I GOT OUT OF THE CAR AND THE FIRE GREW AND COMPLETLY BURNED THE CAR.

**2015 Kia Soul – NHTSA ID NUMBER: 10898504**

Reported on Aug. 25, 2016 – Incident Date: Aug. 24, 2016

THE CAR CAUGHT FIRE UNDER THE HOOD OF THE ENGINE. UPON ARRIVING HOME FROM GROCERY STORE PASSENGER NOTICED SMOKE UNDER THE HOOD. THE FIRE WAS EXTINGUISHED AND THE KIA EMERGENCY ROADSIDE SERVICE WAS CALLED. THE LOCAL KIA DEALER DOESNT WANT ANYTHING TO DO WITH THE CAR EVEN THOUGH THE CAR IS STILL UNDER FACTORY WARRANTY . KIA CORPORATE ISN'T MUCH HELP EITHER SAYING IT WILL BE 2-5 BUSINESS DAYS BEFORE SOMEONE FROM THERE WILL BE ABLE TO COME AND INSPECT IT. IN THE MEANTIME I AM STRANDED IN FORT WAYNE WITH NO TRANSPORTATION. AGAIN THE CAR IS STILL UNDER FACTORY WARRANTY!!!!!!!!!

**2016 Kia Soul - NHTSA ID NUMBER: 11133366**

Reported on Oct. 4, 2018 – Incident Date: Sept. 18, 2018

CAR WAS IN GOOD CONDITION AND WELL MAINTAINED ACCORDING TO MANUFACTURER'S SERVICE SCHEDULE. IT WAS LAST SERVICED ON 7/31/18 WHEN IT PASSED NYS INSPECTION. THE OWNER WAS INFORMED ON 9/18/18 @ 7:03 PM BY DAUGHTER THAT CAR STARTED MAKING A STRANGE SOUND ON 9/17/18. PLANNED TO HAVE DEALER CHECK OUT CAR ON 9/19/18. ON 9/18/18 @

APPROXIMATELY 8:35 PM, WHILE BEING DRIVEN ON THE LOCAL PORTION OF AN INTERSTATE HIGHWAY, THE CAR'S OIL LIGHT BLINKED ON AND OFF. A FEW MINUTES LATER THE CHECK ENGINE LIGHT WENT ON. A FEW MINUTES LATER THE CAR ENGINE BEGAN TO SMOKE AND SMOKE CAME INTO THE CAR THROUGH THE AIR VENTS. THE DRIVER, MY DAUGHTER'S BOYFRIEND, PULLED OVER INTO THE BREAKDOWN LANE, TURNED OFF THE CAR, GOT OUT, STEPPED AWAY FROM IT AND THE ENGINE ERUPTED IN FLAMES. BY APPROXIMATELY 8:50 PM THE CAR WAS TOTALLY ENGULFED IN FLAMES. THE CAR LOOKS LIKE IT WAS FIRE BOMBED.

**2016 Kia Soul – NHTSA ID Number: 11180538**

Reported on Feb. 16, 2019 – Incident Date: July 8, 2017

AFTER A SHORT DRIVE, I PARKED MY 2016 KIA SOUL IN THE GARAGE AND 15 MINUTES LATER I HEARD A NOISE IN THE GARAGE. MY HUSBAND OPENED THE DOOR TO THE GARAGE AND FOUND FLAMES COMING FROM THE STATIONARY KIA. THE ENTIRE GARAGE CAUGHT FIRE AND INCLUDED MY OTHER CAR WHICH WAS AN INFINITI G35. THE PRIMARY FLAMES WERE COMING OUT OF THE HOOD/FRONT RIGHT FENDER SEAM WITH MINOR FLAMES UNDERNEATH THE KIA. WE KNOW THAT THE FIRE STARTED IN THE PASSENGER SIDE OF THE ENGINE COMPARTMENT OF THE KIA SOUL. THE VEHICLE WAS LESS THAN ONE YEAR OLD, HAD APPROXIMATELY 6000 MILES, AND HAD ONLY BEEN SERVICED ONCE AT THE HENDERSON KIA DEALERSHIP FOR AN OIL CHANGE. … WE HAD TO MOVE OUT OF OUR HOME FOR FIVE MONTHS WHILE THE HOUSE WAS BEING REPAIRED. THERE WAS OVER $142,000 DAMAGE TO OUR HOME AND PERSONAL PROPERTY.

140. Moreover, NHTSA received, and Kia and Hyundai reviewed, complaints about the same and closely related engines used in other vehicles, including complaints *before* the 2012 Soul entered the market. These include complaints of similar incidents in 2010 and 2011 Souls for which consumers sought warranty repairs. Examples appear below and additional 2010-2011 Kia Soul reports appear in Appendix A.

**2010 Kia Soul – NHTSA ID NUMBER: 10430517**

Reported on Oct. 17, 2011 – Incident Date: June 30. 2011

I WAS HAVING PROBLEMS WITH THE ELECTRICAL SYSTEM IN THE KIA, AFTER THAT WAS FIXED THE CAR WAS STILL NOT RUNNING RIGHT, IT WAS SLUGGISH AND USING A LOT OF GAS. THE HEAD WAS CRACKED, AND

SEVERAL OF THE VALVES WERE MESSED UP AND EVENTUALLY THE WHOLE ENGINE HAD TO BE REPLACED, THE WHOLE PROCESS TOOK APPROXIMATELY 2 1/2 MONTHS. *TR

**2011 Kia Soul – NHTSA ID NUMBER: 10447319**

Reported on Feb. 9, 2012 – Incident Date: Jan. 9, 2012

THE WHOLE FRONT OF THE CAR WAS ON FIRE AND THE WIND SHIELD EXPLODED. EVERYTHING MELTED DOWN AND CAR IS TOTALED. THIS INCIDENT WAS CAUSED BY AN INTERIOR MALFUNCTION WITH THE CAR. WOULD LIKE KIA TO REPLACE THIS CAR WITH A NEW CAR BECAUSE THIS WAS A NEW CAR THAT I PURCHASED THROUGH KIA. *TR

**2010 Kia Forte – NHTSA ID NUMBER: 10352984**

Reported on Aug. 31, 2010 – Incident Date: Aug. 30, 2010

WHILE DRIVING MY KIA FORTE THE ENGINE STALLED. IT HAPPENED TWO TIMES IN THE LAST PAST TWO MONTHS. AFTER BRINGING MY CAR TWICE TO THE DEALERSHIP THEY SAID THEY CAN NOT FIND ANYTHING WRONG WITH THE CAR BECAUSE THEY DO NOT FIND ANY CODE ON THE COMPUTER. THEY KEEP SENDING ME HOME AND TELLING ME THAT THEY CAN NOT DO ANYTHING. *TR

**2010 Hyundai Elantra – NHTSA ID NUMBER: 10405402**

Reported on June 7, 2011 – Incident Date: May 22, 2011

BLOWN HEAD GASKET ON 2010 HYUNDAI ELANTRA WITH 18,000 MILES, NO WARNINGS, FIRST SMELLED SOMETHING BURNING THEN NOTICED ENGINE COVERED WITH OIL AND OIL DRIPPING TO THE GROUND, DID NOT OVERHEAT. THE GASKET WAS REPLACED AND I WAS TOLD THAT THE GASKET WAS POROUS IN AN AREA (ON THE CORNER) AND THIS IS WHERE THE OIL WAS COMING OUT. *TR

**2011 Hyundai Elantra – NHTSA ID NUMBER: 10462448**

Report Date: June 20, 2012 – Incident Date: June 19, 2012

I WAS TURNING FROM GAS STATION ONTO ROAD, CROSSING 3 LANES OF TRAFFIC WHEN VEHICLE STALLED IN THE MIDDLE OF THE ROAD AND I WAS NEARLY BROAD-SIDED. ALL DASH LIGHTS CAME ON, AND AC AND RADIO WERE ON, BUT ENGINE HAD STALLED. AFTER CALLING HYUNDAI USA I TOOK VEHICLE TO DEALERSHIP, REPORTED AS STALLING AT LOW SPEED AND

ROUGH IDLE. HYUNDAI USA REPRESENTATIVE SAID NO PROBLEMS LIKE THIS REPORTED. ALSO SERVICE ADVISER REPORTED NEVER HEARING OF THE PROBLEM WHEN TOOK INTO DEALERSHIP, DESPITE NUMEROUS REPORTS I HAD PRINTED OFF THE INTERNET. IN FACT SAID "WE DON'T ACKNOWLEDGE INTERNET REPORTS AS BEING VALID". *JS

**2011 Kia Sportage – NHTSA ID NUMBER: 10640482**

Report Date: Oct. 1, 2014 - Incident Date June 9, 2012

2.0 LITER TURBOCHARGED ENGINE FAILED CATASTROPHICALLY WITHOUT WARNING RENDERING VEHICLE UNDRIVEABLE. *TR

**(ii) NHTSA Reports Concerning the "Theta II" Engine in the Hyundai Tucson Class Vehicles**

141. Similarly, numerous owners and lessees of 2011-2013 Hyundai Tucson SUVs complained to the NHTSA. The complaints involve engines stalling and/or seizing due to oil starvation and related issues. Some involve fires. One of the complaints, while reported to NHTSA in April 2017, expressly states that Hyundai was "made aware" of the failure shortly after the incident in June 2013 but claimed that "nothing could be done to assist." Examples appear below and more are appended hereto as Appendix B.

**2012 Hyundai Tucson – NHTSA ID Number 10668152**

Reported on Dec. 24, 2014 – Incident Date: Dec. 20, 2014

TL* THE CONTACT OWNED A 2012 HYUNDAI TUCSON. WHILE PARKED IN A DRIVEWAY, THE VEHICLE CAUGHT FIRE. THE FIRE DEPARTMENT WAS ABLE TO EXTINGUISH THE FIRE. A POLICE AND A FIRE REPORT WERE FILED AND NO INJURIES WERE REPORTED. THE VEHICLE WAS DESTROYED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 53,000.

**2012 Hyundai Tucson – NHTSA ID Number: 11103584**

Reported on June 23, 2018 – Incident Date: May 22, 2018

CATASTROPHIC ENGINE FAILURE ON A 2012 TUCSON WITH ONLY 80K MILES. THE VEHICLE WAS REGULARLY SERVICED. HEARD A FAINT TICKING COMING

FROM THE ENGINE WHILE DRIVING, AND LATER THAT DAY, THE ENGINE BLEW. APPARENTLY THE THETA 2 ENGINE THE VEHICLE USES IS KNOWN FOR FAILURE, BUT THE HYUNDAI DEALERSHIP I TOOK THE VEHICLE TO CLAIMED ONLY ABOUT 2% OF THESE CARS WERE AFFECTED, AND I WAS JUST "UNLUCKY". NO WARNING LIGHTS, NOTHING. WAS ON THE INTERSTATE DURING RUSH HOUR AT THE TIME OF THE INCIDENT, AND WAS ALMOST HIT BY MULTIPLE VEHICLES BECAUSE OF THIS.

**2013 Tucson – NHTSA ID NUMBER: 10978772**

Reported on Apr. 17, 2017 – Incident Date: June 30, 2013

TL* THE CONTACT OWNS A 2013 HYUNDAI TUCSON. WHILE DRIVING VARIOUS SPEEDS, THE VEHICLE STALLED AND THE ENGINE SEIZED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER, BUT THE CAUSE OF THE FAILURE COULD NOT BE DUPLICATED. THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 17V226000 (ENGINE). THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND INFORMED THE CONTACT THAT NOTHING COULD BE DONE TO ASSIST. THE FAILURE MILEAGE WAS APPROXIMATELY 61,000.

**2013 Hyundai Tucson – NHTSA ID NUMBER: 11110275**

Reported on July 9, 2018 – Incident Date: July 6, 2013

DRIVING ON FREEWAY, ON VACATION, WHEN HEARD CLACKING NOISE. BECAME WORSE AND ALL OF A SUDDEN THE ENGINE QUIT AND THE ENGINE LIGHT CAME ON. TOWED TO REPAIR SHOP. TOLD US THE ENGINE NEEDED REPLACED. NOT SURE IF TRUE, BUT WE HAVE BEEN TOLD THAT THIS IS THE SAME ENGINE THAT WAS RECALLED IN THE SONATAS (WE HAVE A SONATA THAT HAD THE RECALL). QUESTIONING WHY THE MOTORS ON ALL VEHICLES WITH THAT ENGINE WERE NOT RECALLED. SEEMS THE PROBLEM IS WITH THE ENGINE, NOT THE VEHICLE.

**2013 Hyundai Tucson NHTSA ID Number: 11119738**

Reported on Aug. 13, 2018 – Incident Date: June 17, 2018

ON JUNE 17, 2018 MY ENGINE BLEW ON MY 2013 TUCSON, LESS THAN 75000 MILES. WE WERE TRAVELING ON THE INTERSTATE AT SPEEDS OF 75 MILES PER HOUR WHEN THE ENGINE BEGAN TO KNOCK THEN LOOSE SPEED. TRAFFIC ALL AROUND US WAS TRAVELING AT 75-80 MILES PER HOUR, VERY SCARY AS WE WERE GOING 10-15 MILES PER HOUR WHEN WE MANAGED TO PULL OFF ON AN EXIT AND THE ENGINE SIMPLY DIED AND NEVER WOULD RESTART. WE HAD TO PUSH IT THROUGH A BUSY INTERSECTION TO A GAS

STATION. WE HAD IT TOWED TO THE LOCAL HYUNDAI DEALER WHERE IT STILL SITS 2 MONTHS LATER WAITING ON AN ENGINE TO BE DELIVERED.

142. Moreover, NHTSA received, and Hyundai reviewed, complaints concerning similar defects in the Theta II engine as used in other vehicles before the Tucson Class Vehicles went on sale and before Plaintiffs purchased or leased their Class Vehicles. Many of these complaints involve the same issues alleged above and also note that the vehicles were taken to dealers. Every claim for warranty repair, or inquiry about whether a failure would be covered, would be reported to and reviewed by Hyundai for a decision, and some complaints explicitly state that the manufacturer was notified of the issue. Examples appear below relating to the 2010 Hyundai Santa Fe and 2011 Hyundai Sonata, some of which, like the Tucson, came equipped with a 2.4-liter Theta II engine. Additional examples are appended hereto as Appendix C.

**2010 Hyundai Santa Fe – NHTSA ID NUMBER: 10440956**

Reported on Dec. 22, 2011 – Incident Date: June 20, 2011

TL* THE CONTACT OWNS A 2010 HYUNDAI SANTA FE. THE CONTACT STATED THAT THE VEHICLE WOULD SPORADICALLY STALL WITHOUT WARNING. THE DEALER WAS UNABLE TO DIAGNOSE THE FAILURE. THE MANUFACTURER WAS IN THE PROCESS OF ASSISTING THE CONTACT WITH THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 3 AND THE CURRENT MILEAGE WAS 7,650.

**2011 Hyundai Santa Fe – NHTSA ID NUMBER 10410037**

Reported on June 30, 2011 – Incident Date: June 19, 2011

NEW SANTA FE, 45 DAYS OLD, SCREECHING / METAL ON METAL GRINDING SOUND. DEALERSHIP COULD NOT FIND A PROBLEM.

AT 3 MONTHS OLD, CAR ENGINE TURNED OFF WHILE DRIVING. DEALERSHIP COULD NOT FIND A PROBLEM. NOTHING DONE TO CORRECT THE FAILURE. DO NOT TRUST CAR. *TR

**2011 Hyundai Sonata – NHTSA ID NUMBER: 10456162**

Reported on Apr. 23, 2012 - Incident Date: Apr. 19, 2012

TL* THE CONTACT OWNS A 2011 HYUNDAI SONATA. THE CONTACT STATED THAT THE CHECK ENGINE WARNING LIGHT WAS ILLUMINATED. THE VEHICLE WAS TOWED TO THE DEALER FOR DIAGNOSTICS, WHICH LOCATED THE FAILURE AT THE ENGINE. THE ENGINE OIL EXPERIENCED A BLOCK THAT CAUSED THE OIL NOT TO CIRCULATE AND THE ENGINE TO FAIL. THE ENGINE WOULD NEED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE FAILURE AND THE CURRENT MILEAGE WAS 30,000.

**2011 Hyundai Sonata - NHTSA ID NUMBER: 10493168**

Reported on Jan. 16, 2013 – Incident Date Oct. 2, 2012

BEGINNING OF OCTOBER 2012 I KEPT HEARING RATTLING, CLANKING NOISE COMING FROM UNDER THE HOOD. I TOOK THE CAR TO A HYUNDAI DEALER WHERE I LIVE OCTOBER 26, 2012 . THEY CHECKED OUT THE CAR AND TOLD ME BECAUSE THE ENGINE LIGHT DIDN'T COME ON, THEY COULDN'T FIND A CODE TO FIX THE CAR AND TO BRING THE CAR IN WHEN THE ENGINE LIGHT COMES ON. I KEPT DRIVING THE CAR AND HEARING THE SAME NOISE. I TOOK IT TO MEINEKE TO GET AN OIL CHANGE NOVEMBER 14, 2012. DROVE THE CAR APPROXIMATELY 3 WEEKS AND STILL HEARD THE NOISE. I TOOK IT TO ANOTHER HYUNDAI DEALER . THEY SAID THE CAR DIDN'T HAVE ANY OIL AND MEINKE FORGOT TO PUT THE DRAIN PLUG BACK IN, THEREFORE IT MESSED UP THE ENGINE, AND THAT'S WHY I HEARD THE NOISE. I KEPT TELLING THEM, I HEARD THE NOISE BEFORE THE OIL CHANGE. I TOOK IT BACK TO MEINKE AND SHOWED THEM THE PAPER HYUNDAI GAVE ME, THEY GAVE ME MY MONEY BACK AND APOLOGIZED. STILL HEARING THE NOISE, I TOOK IT BACK TO THE FIRST HYUNDAI DEALER AND THEY SAID IT WAS ENGINE PROBLEMS AND I HAD TO PAY THE DIAGNOSTIC FEE BECAUSE MY WARRANTY WAS VOIDED DUE TO MEINEKE. I REFUSED TO PAY THE FEE BECAUSE MY CAR IS UNDER WARRANTY. THEY WOULDN'T GIVE ME MY CAR BACK UNTIL I PAID, WE ARGUED BACK AND FORTH AND I CALLED THE POLICE AND THEY GAVE ME MY CAR BACK, BUT TOLD ME NOT TO COME BACK ON THEIR PROPERTY. I THEN TOOK THE CAR TO WHERE I PURCHASED IT AND SAME THING. THEY SAID TO TRY A GAS ADDITIVE 3 TIMES, IF THAT DOESN'T WORK, GET AN OIL CONSUMPTION TEST IN MY AREA WHERE I LIVE. I NEED MY CAR FIXED AND NO ONE WILL FIX IT. HYUNDAI BLAMES MEINEKE AND MEINEKE BLAMES HYUNDAI. THEY'RE SAYING BECAUSE OF NO ENGINE LIGHT ON, THEY CAN'T SEE THE PROBLEMS, BUT ONE DEALER SAID IT WAS THE ENGINE ANOTHER SAYING GAS PROBLEMS. BOTTOM LINE, IF THE FIRST HYUNDAI DEALER HAD KEPT MY CAR, I WOULDN'T BE GOING THROUGH THIS. HOW CAN I RESOLVE THIS? *TR

**(iii) Despite These Complaints, Hyundai and Kia Concealed the Defects From Consumers.**

143. Despite the 300-plus vehicle fire reports NHTSA ultimately received, Hyundai and Kia representatives initially dismissed the dangers their vehicles posed to consumers, claiming that "[i]n some very rare instances—a rate of less than 1 percent—the affected engines have caught on fire. An exhaustive study has confirmed that there is no defect trend outside of that identified in the related recalls causing non-collision fires in Hyundai vehicles."[36] Even if this estimate is accurate, 1% of the 1.7 million or more vehicles Defendants have recalled for engine fire risks so far amount to 17,000 engine fires suffered by American consumers, and would mean more than 8,000 fires in Class Vehicles.

144. Defendants' irresponsibly slow reaction and failure to adequately remedy the stalling and engine fires caused by their defective vehicles drew the interest of the Senate Commerce Committee, which invited the automakers to defend their lack of response. Though they were asked to "promptly identify and respond to defects that may pose a fire risk" at a November 14, 2018 hearing, and despite the ongoing investigation into why hundreds or thousands of their vehicles were spontaneously bursting into flames, the Hyundai and Kia executives refused to attend the congressional hearing.

145. In response to Defendants' refusal to appear before Congress, Jason Levine, executive director of the Center for Auto Safety, said: "Until Hyundai and Kia are willing to take responsibility for the three million vehicles on the road that could burst into flames at any minute—with no apparent warning to the driver—we will continue to press for a recall and full

---

[36] Kyle Hyatt, *Center for Auto Safety calls out Hyundai and Kia over lack of fire recall,* CNet (Oct. 12, 2018), https://www.cnet.com/roadshow/news/hyundai-kia-center-for-auto-safety-fire-recall/ (last visited Mar. 1, 2019).

and thorough investigation. There has already been one death and a few injuries associated with these vehicle fires. How many people need to be horrifically burned before someone takes action?"[37]

146. Though more than three years had gone by since the original 2015 recall of vehicles with "Theta II" engines, Kia claimed in late 2018 that the company was working with the Senate committee to "analyze all relevant information associated with any fire or other safety-related matters and will take any necessary corrective action in a timely manner."[38] However, Defendants' failure to respond proactively to these dangerous defects, and lengthy concealment of them, is unsurprising in light of the previous delays and failed recall of the "Theta II" engines.

147. For the 2011-2013 Hyundai Tucson, despite the announced recall, Hyundai's belated fix does nothing to address engine damage accrued already as a result of the defect, but seeks instead—at most—to prevent some future oil leaks. For the 2012-2016 1.6-liter Kia Soul, Kia proposes to simply reprogram the catalytic converter, which may not be permissible under emissions regulations and, in any event, is unlikely to repair an engine defect of this severity. For those who have already suffered damaged engines, Kia proposes to replace their engines with the same defective design. The recall does not provide for compensation to those whose engines have already failed, or who have paid out of pocket to repair or replace them. Finally, for the 2012-2016 2.0-liter Kia Soul, Kia has not taken any action at all but has, as Plaintiff Ronfeldt

---

[37] Jackie Callaway, *Kia, Hyundai CEOs refuse to attend Senate hearing to explain cause of car fires,* ABC Action News (Nov. 8, 2018, updated Dec. 10, 2018), https://www.abcactionnews.com/news/local-news/i-team-investigates/kia-hyundai-ceos-refuse-to-attend-senate-hearing-to-explain-cause-of-car-fires (last visited Mar. 1, 2019).

[38] *Id.*

experienced, denied responsibility and warranty coverage for engine failures resulting from the defect. These recalls—or lack thereof—are too little, too late.

**4. Defendants Continuously Touted Class Vehicles as Safe and Dependable, Concealing the Engine Defect**

148. Defendants' long term, overarching marketing message for their brand, and specifically the Class Vehicles, was that their vehicles are safe and dependable and that their engines can be relied on to perform well. This marketing message is unfair and deceptive, as Defendants concealed and omitted the engine defect which causes Class Vehicles to suffer catastrophic engine damage leading to stalls, failures, or fires.

149. As demonstrated in Section IV.3(a) above, Defendants spent a significant amount of time and money associating with their brands that their vehicles are expertly tested and fine-tuned. However, as described in more detail herein, that message is false and deceptive, and Defendants knew it. Rather than telling Plaintiffs and the Class about the truth of the engine defect, Defendants omitted and concealed it, and to this day actively conceal it.

150. As part of their pervasive and general marketing message, Defendants made more specific statements about the safety and dependability of the Class Vehicles. For example, as far back as 2011, Hyundai touted the safety and dependability of the Tucson, but failed to disclose the engine defect. For example, the below is a screenshot from a sales brochure for a 2011 Hyundai Tucson:[39]

[39] https://cdn.dealereprocess.org/cdn/brochures/hyundai/2011-tucson.pdf (last visited April 30, 2020).




151. Hyundai made similar omissions in the 2012 and 2013 Tucson sale brochures, as demonstrated below:[40]

---

[40] https://cdn.dealereprocess.org/cdn/brochures/hyundai/2012-tucson.pdf (last visited April 30, 2020); https://cdn.dealereprocess.org/cdn/brochures/hyundai/2013-tucson.pdf (last visited April 30, 2020).

## PROOF THAT YOU DON'T NEED 8 CYLINDERS TO PACK A POWERFUL PUNCH.

At least, not when you're utilizing the advancements found in Tucson's 2.4-liter Theta 2 engine. It delivers up to 176 horsepower and an estimated 32 mpg on the highway.[1] It also received the state of California's notoriously strict and highly regarded PZEV (Partial Zero Emissions Vehicle) rating and ULEV (Ultra Low) in other states.[2] Also contributing to Tucson's remarkable efficiency are two transmissions: A 5-speed manual mated to the GL model's 2.0-liter engine, or a 6-speed SHIFTRONIC® automatic transmission[3] that matches the engine's speed and load with just the right gear, at just the right moment. Ensuring your Tucson is as beautiful on the road as it is on the eyes.





### ECO SHIFTING

Fuel efficiency is maximized through Tucson's unique Eco indicator, which signals manual-transmission drivers using an indicator when it's time to shift for maximum fuel efficiency. On automatic transmissions, an Active ECO System regulates the engine and transmission for optimum fuel economy.





### ALL WHEEL DRIVE

Confidence at all four corners. It's a feeling you'll appreciate when the road becomes slick or the surface goes from paved to unpaved. Tucson's available All Wheel Drive is a thumb click away, distributing power to the wheels with the best traction. There's also a driver-selectable AWD lock that distributes power evenly between the front and rear axles for improved traction off-road and under slippery driving conditions.



### TIMING IS EVERYTHING

Continuously Variable Valve Timing helps the Tucson's engine breathe more efficiently, which results in optimal power delivery from each drop of fuel. Think of it as the engineering equivalent of yoga, with a payoff of less pain at the pump.

### LESS IS MORE

Lighter objects take less energy to move. Which is why our engines utilize aluminum alloys for the cylinder block and other core components. Their lightweight design translates into more responsive acceleration, nimble handling and better fuel economy.




152. Kia made similar representations about the Kia Soul, too, without disclosing the engine defect. For example, below is a screenshot of a sales brochure for a 2012 Kia soul:[41]

[41] https://cdn.dealereprocess.net/cdn/brochures/kia/2012-kiasoul.pdf (last visited April 30, 2020).

> Information Provided by: DEALER E-PROCESS
>
> **A passion for excellence.**
>
> For decades, Kia Motors has focused on building vehicles that reflect a commitment to quality, durability and product innovation. Today, we offer models to suit most every driving need. The value found in every Kia vehicle has been widely recognized, and Kia Motors has been one of the fastest-growing automotive brands in America for the past five years.[14]

153. Kia made identical claims, and omissions, in the 2013 Kia Soul sales brochures:[42]

> **A passion for excellence.**
>
> For decades, Kia Motors has focused on building vehicles that reflect a commitment to quality, durability and product innovation. Today, we offer models to suit most every driving need. The value found in every Kia vehicle has been widely recognized,[14] and Kia Motors has been one of the fastest-growing automotive brands in America for the past five years.[15]

154. Below is a screenshot from a 2014 Kia Soul sales brochure:[43]

> **Delivering on a promise**
>
> Kia is committed to producing world-class vehicles to suit most every driving need. This promise has led to the development of stylish vehicles with an extraordinary combination of precision engineering, outstanding performance, innovative features and advanced safety systems. The value found in every Kia vehicle has been widely recognized[16] — one reason Kia has been honored in Interbrand's Best Global Brands 2012 report.[17]

155. Kia made identical claims, and omissions, in the 2015 and 2016 Kia Soul sales brochures:[44]

---

[42] https://cdn.dealereprocess.org/cdn/brochures/kia/2013-soul.pdf (last visited April 30, 2020).

[43] https://cdn.dealereprocess.net/cdn/brochures/kia/2014-soul.pdf (last visited April 30, 2020).

[44] https://cdn.dealereprocess.org/cdn/brochures/kia/2015-soul.pdf (last visited April 30, 2020); https://cdn.dealereprocess.net/cdn/brochures/kia/2016-soul.pdf (last visited April 30, 2020).

> **Delivering on a promise**
>
> Kia is committed to producing world-class vehicles to suit most every driving need. This commitment has led to the development of stylish vehicles with an extraordinary combination of precision engineering, outstanding performance, innovative features and advanced safety systems. Kia's dedication to quality and value has been widely recognized — one reason why Kia has been named as a top 100 brand in Interbrand's Best Global Brands 2013 report.[15] In addition, Kelley Blue Book's KBB.com has announced the recipients of its Brand Image Awards, naming Kia as the 2014 Best Value Brand. This honor recognizes our success at producing fuel-efficient and affordable vehicles.[16]

> **Delivering on a promise**
>
> Kia is committed to producing world-class vehicles to suit most every driving need. This commitment has led to the development of stylish vehicles with an extraordinary combination of precision engineering, outstanding performance, innovative features, and advanced safety systems. Kia's dedication to quality and value has been widely recognized — one reason why Kia has been named as a top 100 brand in Interbrand's 2014 Best Global Brands report.[18]

156. But Defendants' claims, and omissions, about the Class Vehicles are not isolated. Rather, Defendants' unfair and deceptive omissions are part of a uniform, long term, pervasive marketing message of safety and dependability that Defendants sought to associate with their brands. As far back as 2005, Defendants touted the "unsurpassed" capabilities of its vehicles,

such as safety and dependability. For example, below are screenshots from a 2005 Hyundai Tucson sales brochure:[45]







---

[45] http://www.auto-brochures.com/makes/Hyundai/Tucson/Hyundai_US%20Tucson_2005.pdf (last visited April 30, 2020).

157. Defendants' marketing message is so long term, uniform, and pervasive it continued through the Class period and up to this day. For example, below is a screenshot from a 2020 Hyundai Tucson sales brochure:[46]

> It sounds like this: The remarkably quiet Tucson interior. Pull the door shut and listen for the door closing – Hyundai engineers fine-tuned the acoustics of the latch mechanism for a solid, secure thunk. Now start the engine. The sonic response of its available 2.4L GDI engine is unmistakably powerful.
>
> Accelerate from a stop, and Tucson's 6-speed automatic transmission moves through the gears with the smooth precision of a luxury sedan. To ensure a quiet ride, Tucson's designers infused its unibody construction with generous amounts of advanced high-strength steel for improved body stiffness, along with sound dampening materials to suppress road noise.
>
> Call up a song from your favorite playlist. What it sounds like on Tucson's available 8-speaker Infinity® Premium Audio system may astonish you. The system uses Clari-Fi™ Music Restoration Technology, which brings your songs back to life by restoring the full sound spectrum lost in today's compressed digital music files.
>
> Here's another cool feature: Solar-control glass. Used in Tucson's windshield and front windows, it helps keep cabin temperatures from heating up. Rear seat A/C vents – normally reserved for upscale SUVs – are also available to help ensure passenger comfort during the warm summer months. When the script is flipped, Tucson chases away the chill with available features like heated front seats, heated rear seats, heated side mirrors and a heated steering wheel.
>
> And because precise design is uncluttered, Tucson has cut the cords with available wireless device charging, making it simple to keep your compatible smartphone powered on the road.[1] There's also an available rear USB power outlet, so your crew in the back seats has easy access to power, too.

158. Defendants' marketing message was so long term, pervasive, and uniform that Plaintiffs and Class members, by Defendants' design, associated safety and dependability with Defendants and the Class Vehicles, which is a primary reason they purchased their Class Vehicle.

159. However, a car with a defective engine, like the Class Vehicles, is not a safe or dependable car. Thus, Defendants' marketing message is unfair and deceptive and omits facts that would be material to consumers, such as Class members, who purchased or leased the Class Vehicles because they were consistently marketed as having the utmost safety and dependability on the road.

---

[46] http://www.auto-brochures.com/makes/Hyundai/Tucson/Hyundai_US%20Tucson_2020.pdf (last visited April 30, 2020).

160. Defendants' marketing of their brands, and the Class Vehicles, with a long term, uniform, and pervasive message of safety and dependability without disclosing the engine defect is unfair and deceptive. Specifically, Defendants failed to disclose at and after the time of purchase, lease, or service any and all known material defects of the Class Vehicles, including the engine defect.

161. Defendants' deceptive marketing and willful and knowing failure to disclose the engine defect damaged, and continues to damage, Plaintiffs and Class members. Had Plaintiffs and Class members known about the engine defect, they would not have purchased their Class Vehicle, or certainly would have paid less to do so.

**5. Defendants' Concealment of the Defects in the Engines Caused Class Members Significant Harm.**

162. Owners and lessees of Class Vehicles did not receive the vehicles they bargained for at the time of purchase. Plaintiffs bought vehicles they presumed were fit for sale and free of any serious safety-related defects. Had Defendants disclosed the true nature of these vehicles and the risks they posed, Plaintiffs would have paid less for them or chosen to purchase other vehicles. Defendants did not tell Plaintiffs that they were purchasing vehicles with serious safety-related defects. As a result of Defendants' conduct—in failing to remedy dangerous defects that Defendants knew about, and in failing to disclose and/or actively concealing these defects even in the face of complaints and regulatory investigations—consumers have been driving unsafe vehicles that could suddenly stall at speed or burst into flames.

163. Even if Defendants hadn't learned of the defects through durability testing before the Class Vehicles entered production, and even if similar problems in the same or closely related engines in other models hadn't already put them on notice that these engines were and are

defective, they certainly learned that consumers were experiencing serious and dangerous defects in the Class Vehicles from NHTSA complaints and warranty claims. At the latest, they were no notice by May 2012 for the Soul Class Vehicle and June 2013 for the Tucson Class vehicles—before any named Plaintiff purchased or leased a Class Vehicle.

**6. Defendants' Recalls and Proposed Fixes Are Insufficient**

164. Plaintiffs are skeptical that the proposed recalls can or will actually repair the defects, based both on Defendants' track record of failed recall repairs for similar defects and on the nature of these defects and the proposed repairs. But at this late stage, even a successful recall campaign would not make Plaintiffs whole for the overpayment injury suffered at the time of purchase, for the risk associated with years of driving vehicles with dangerous defect for years, or for the inconvenience and expense associated with extensive repairs and the time it will likely to take to achieve a "final" fix. Finally, Plaintiffs believe that, as a result of Defendants' conduct, the market values of the Class Vehicles have been reduced.

165. Defendants' new recalls affect more than half a million vehicles on the road and are part of a lengthy string of recalls for engine fires and failures. Defendants delayed taking action despite the fact that they received hundreds of complaints about engine fires, despite the fact that durability testing should have informed them of the safety-related defects before the Class Vehicles went on sale, and despite the fact that they knew about the dangerous defect in the 1.6-liter Soul long enough ago to develop a solution for 2017 model year vehicles manufactured in 2016, and Plaintiffs are skeptical that the proposed recall will actually repair the

root cause of the defect or merely resolve one symptom.[47] For the 2011-2013 Hyundai Tucson, nine years of inaction is too long, and the proposed recall still does not actually repair any damage suffered as a result of the defect. Defendants have still done nothing to remedy the defect in the 2.0-liter Kia Soul. This inaction is unacceptable in light of the risks presented by the serious safety-related defects present in all of the Class Vehicles—namely, that the engines can suddenly stall, be destroyed, and/or burst into flames.

## V. CLASS ACTION ALLEGATIONS

### A. Class Definitions

166. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves, the Nationwide Class, and State Classes, defined as:

**Nationwide Class:**

All persons or entities in the United States (including its territories and the District of Columbia) who purchased or leased a Class Vehicle.

167. In addition to the Nationwide class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Arizona State Class:**

All persons or entities in the state of Arizona who purchased or leased a Class Vehicle.

**California State Class:**

---

[47] Tracy Samilton, *Hyundai and Kia recall more vehicles over engine fires/failures,* NPR Michigan Radio (Feb. 28, 2019), https://www.michiganradio.org/post/hyundai-and-kia-recall-more-vehicles-over-engine-firesfailures (last visited Mar. 2, 2019).

All persons or entities in the state of California who purchased or leased a Class Vehicle.

**Missouri State Class:**

All persons or entities in the state of Missouri who purchased or leased a Class Vehicle.

**North Carolina State Class:**

All persons or entities in the state of North Carolina who purchased or leased a Class Vehicle.

**Ohio State Class:**

All persons or entities in the state of Ohio who purchased or leased a Class Vehicle.

**Pennsylvania State Class**

All persons or entities in the state of Pennsylvania who purchased or leased a Class Vehicle.

**Texas State Class:**

All persons or entities in the state of Texas who purchased or leased a Class Vehicle.

**Washington State Class:**

All persons or entities in the state of Washington who purchased or leased a Class Vehicle.

**West Virginia State Class:**

All persons or entities in the state of West Virginia who purchased or leased a Class Vehicle.

168. Excluded from the Classes are individuals who have personal injury claims resulting from the conduct and defects alleged herein; Defendants and their subsidiaries, affiliates, and officers; all persons who timely elect to exclude themselves from the Classes; and the Judge to whom this case is assigned and his or her immediate family. Plaintiffs reserve the right to revise the Class definitions based on information learned through discovery.

169. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim. This action has been brought and may be properly maintained on behalf of the Nationwide Class and/or State Class proposed herein under Federal Rule of Civil Procedure 23.

170. Plaintiffs reserve the right to modify the definition of the Nationwide and/or any State Class prior to class certification.

**B. Class Certification Requirements**

171. **Numerosity: Rule 23(a)(1):** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe, based on available information on the volume of sales and recalls of Class Vehicles, that there are no fewer than 500,000 members of the Class. The precise number of Class members may be ascertained from Defendants' records and vehicle registration records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

172. **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3):** This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

A. Whether Defendants engaged in the conduct alleged herein;

B. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

C. Whether the Class Vehicles have the defects alleged herein, and whether those defects constitute a safety-related defect;

D. Whether Defendants knew that the Class Vehicles contained defects as alleged herein;

E. Whether a reasonable consumer would consider the defects alleged herein and their consequences material to the decision to purchase or lease a Class Vehicle;

F. When Defendants discovered, knew, of the existence of the defects alleged herein;

G. Whether the Class Vehicles can be made to comply with applicable emissions standards if the proposed recall repairs are effectuated without substantially degrading the performance, efficiency, or advertised emissions of the Class Vehicles;

H. Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of the defects and Defendants' concealment thereof;

I. Whether Defendants had a duty to disclose the true nature of the Class Vehicles to Plaintiffs and Class members;

J. Whether Plaintiffs suffered out-of-pocket losses as a result of the defects alleged herein and whether they will suffer out-of-pocket losses as a result of the proposed recalls;

K. Whether Defendants omitted, concealed, and/or failed to disclose material facts about the Class Vehicles;

L. Whether Defendants' concealment of the true nature of the Class Vehicles would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

M. Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

N. Whether the remedies proposed below for each group of Class Vehicles would constitute adequate and appropriate relief for the Class:

| Year and Model | Defendants' Proposed Recall | Proposed Class Relief |
|---|---|---|
| 2012-2016 Kia Soul 1.6 | Reprogram ECU, replace catalytic converter, and/or replace engine block if already damaged. | Buyback or, if repair is effective, additional warranty coverage and monetary compensation. |
| 2012-2016 Kia Soul 2.0 | None. | Buyback or, if repair is possible, recall and monetary compensation. |
| 2011-2013 Hyundai Tucson | Inspect oil pan for prior leaks, replace oil pan if leaks exist, and replace oil pressure switch. | Buyback or, if repair is possible, recall with engine inspection, warranty coverage, and monetary compensation. |

O. Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

P. Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

173. **Typicality: Rule 23(a)(3):** Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and each Class member purchased a Class Vehicle and were similarly injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members

suffered damages as a direct, proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

174. **Adequacy: Rule 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

175. **Declaratory and Injunctive Relief: Rule 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

176. **Superiority: Rule 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. EQUITABLE TOLLING

### A. Discovery Rule

177. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, Defendants' deception concerning the safety-related defects alleged herein.

178. Defendants' concealment was effective until as late as 2019 when the NHTSA investigation prompted by consumer complaints forced Defendants to institute the recent recall campaign, and likely remains effective as to the 2.0-liter Kia Soul Class Vehicle for which no such recall has been announced.

179. Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the defects alleged herein until the NHTSA recall campaign revealed it to the public.

180. Unless a Class member experienced a catastrophic engine failure, like Plaintiffs Twigger, Smith, Frazier, and Wight did, Plaintiffs and Class members would have no reason to discover the defects alleged herein, and even if they did experience such a failure, would have no reason to discover the existence of a widespread defect and effort to conceal it.

181. Plaintiffs and Class members therefore did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants had concealed information about defects in the Class Vehicles until shortly before this action was filed.

182. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

**B. Fraudulent Concealment**

183. All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

184. Defendants concealed the defects and failed to disclose or remedy them for years, from at least as early as May 2012 for the Soul Class Vehicles and June 2013 for the Tucson Class Vehicles, if not earlier based on durability testing and complaints about the same engines in other vehicles. This concealment continues to date. Even now, with NHTSA recalls pending, Defendants offer a fix that is almost certainly inadequate for the two of the defects despite acknowledging the important safety connection. As to the third, Defendants still have not admitted the existence of or proposed any action to remedy the defect in the 2.0-liter Soul Class Vehicles.

185. Even after the filing of this and other lawsuits concerning the Kia Soul 1.6-liter defect, Kia has persisted in misleading its customers. On April 8, 2019, Kia provided to NHTSA for publication a Q&A document intended for consumers that says, in pertinent part, that Kia has not had any litigation regarding the defect.[48]

---

[48] SC176 – 2012-2016 MY Kia Soul Engine Control Unit (ECU) Logic Upgrade Safety Recall Campaign Q&A, April 8, 2019, https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V120-2440.pdf (last visited April 29, 2019).

**SC176 – 2012-2016 MY KIA SOUL ENGINE CONTROL UNIT (ECU) LOGIC UPGRADE SAFETY RECALL CAMPAIGN**
**Q & A**

**April 8, 2019**

…

**Q10. Has Kia had any litigation regarding this condition?**

*A10. No.*

### C. Estoppel

186. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, including the vehicles' safety-related defects as alleged herein, and the inevitable repairs, costs, time, and monetary damage resulting therefrom. Defendants actively concealed the true character, quality, and nature of the Class Vehicles and did not disclose the safety-related defects until very recently, when they finally instituted a recall related to some Class Vehicles, but not others.

187. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII. CLAIMS FOR RELIEF

188. California state law applies to the claims of the Nationwide Class because Defendants' United States operations are headquartered in California. Defendants HMA and KMA distribute, market, warrant, and test all Hyundai and Kia vehicles, respectively, sold or

leased in the United States, including the Class Vehicles. Although these actions take place and have effects wherever in the United States the vehicles are sold, leased, registered, and operated, Defendants' operations for distributing, engineering and testing, marketing, warrantying and supervising service of the Class Vehicles are located in California, and on information and belief, many of the decisions concerning Defendants' unfair, deceptive, and unlawful conduct emanated from these California headquarters.

**COUNT I**
**FRAUD BY CONCEALMENT**
**(Common Law)**

189. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

190. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, or alternatively, each of the State Classes, against all Defendants.

191. The Defendants intentionally concealed, suppressed, and failed to disclose the material fact that the Class Vehicles had design and manufacturing defects that could result in sudden and catastrophic engine stalling, failure, and fire. Defendants knew of the defects at least as early as 2012 due to (1) their involvement in the design, installation, calibration, manufacture, durability testing, and warranty service of the engines, catalytic converters, oil pans and pressure sensors, and ECU programming in the Class Vehicles, and (2) the dozens/hundreds of relevant NHTSA complaints filed related to Class Vehicles starting in 2012 for the Soul and 2013 for the Tucson, as well as various complaints filed related to the same problems in Defendants vehicles with closely related engines beginning as early as 2011, which prompted numerous recalls for those vehicles but not Class Vehicles. And yet, at no time did any of these Defendants reveal the truth to Plaintiffs or the Class. To the contrary, each

Defendant concealed the truth, intending for Plaintiffs and the Class to rely on these omissions. Each Plaintiff and Class member purchased or leased a Class Vehicle believing, in reliance on Defendants' statements and omissions, it to be safe and free from major engine defects.

192. A reasonable consumer would not know that the catalytic converter in 1.6-liter Kia Soul vehicles could overheat, resulting in catastrophic engine failure and/or fire. Nor would a reasonable consumer know that the oil pan in Hyundai Tucson vehicles could leak, resulting in engine stalls, failures, and/or fires. A reasonable consumer also would not know—because Defendants still have not admitted—that 2.0-liter Kia Soul vehicles suffer from a defect that can also result in catastrophic engine failures and fires. Plaintiffs and the members of the Class did not know of the facts which were concealed from them by Defendants. Moreover, as ordinary consumers, Plaintiffs and the members of the Class did not, and could not, unravel the deception on their own.

193. Defendants had a duty to disclose that these defects existed. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs or the members of the Class unless and until the defect manifested in their personal vehicle. Additionally, the defects were safety related because they could cause engine stalls, at speed, and fires. As alleged herein, Defendants denied and concealed the defects in the face of consumer complaints and regulatory investigations. Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own.

194. Defendants also had a duty to disclose the true nature of these vehicles as a result of their prior recalls. By issuing recalls of certain vehicles and representing that these represented the full population of affected vehicles, Defendants led consumers and even safety

regulators to believe, at least for a time, that they were remedying the engine fire problems. In fact, these recalls—in addition to being unsuccessful—failed to include hundreds of thousands of additional vehicles that suffered from similar major defects. For those vehicles for which Defendants have now announced recalls, those recalls do not go nearly far enough to remedy the problems or compensate consumers.

195. Had Defendants not concealed the material facts of the safety-related defects, Plaintiffs and the Class would not have purchased the Class Vehicles or would have paid less for them. Class Vehicles have also diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to Plaintiffs and the members of the Class for damages in an amount to be proven at trial.

196. Defendants' acts were committed wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

197. Even after the filing of this and other lawsuits concerning the Kia Soul 1.6-liter defect, Kia has persisted in misleading its customers. On April 8, 2019, Kia provided to NHTSA for publication a Q&A document intended for consumers that says, in pertinent part, that Kia has not had any litigation regarding the defect.[49]

---

[49] SC176 – 2012-2016 MY Kia Soul Engine Control Unit (ECU) Logic Upgrade Safety Recall Campaign Q&A, April 8, 2019, https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V120-2440.pdf (last visited April 29, 2019).

KIA

**SC176 – 2012-2016 MY KIA SOUL ENGINE CONTROL UNIT (ECU) LOGIC UPGRADE**
**SAFETY RECALL CAMPAIGN**
**Q & A**

**April 8, 2019**

…

**Q10. Has Kia had any litigation regarding this condition?**

*A10. No.*

198. Meanwhile, there is still no proposed recall at all for the Kia Soul with the 2.0-liter "Nu" engine.

199. Plaintiffs plead this count pursuant to the laws of California, where Defendants' United States operations are headquartered, on behalf of all members of the Class. As necessary, and in the alternative, Plaintiffs may allege state subclasses, based on the residences at pertinent times of members of the Class, to allege fraudulent concealment under the laws of states other than California.

**COUNT II**
**IMPLIED AND WRITTEN WARRANTY**
**Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301 *et seq.*)**

[DISMISSED WITH PREJUDICE]

## COUNT III
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
## (Cal. Bus. & Prof. Code § 17200, *et seq*.)

200. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

201. Plaintiffs bring this action on behalf of themselves and the Nationwide Class against all Defendants or, in the alternative, Plaintiffs Parker, Alexander, and Perry bring this claim on behalf of the California State Class against all Defendants.

202. California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

203. Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL by knowingly and intentionally concealing the serious safety-related defects in the Class Vehicles from Plaintiffs and Class members, as well as the risks of serious harm and monetary damage stemming therefrom. This information was material to Plaintiffs and Class members, just as it would have been to any reasonable consumer who purchased a vehicle that he or she believed was fit to drive and not at risk that it may suddenly stall at speed and ignite in flame.

204. Defendants were in a superior position to know the true nature of the Class Vehicles and Plaintiffs and Class members could not discover the true facts about the defects through ordinary and reasonable diligence. Defendants also had a duty to disclose the defects because they constitute a safety issue for drivers and passengers of Class Vehicles.

205. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, they continued to produce and market Class

Vehicles for sale after that date. Plaintiffs and Class members purchased or leased their Vehicles after Defendants had notice of the defects.

206. Defendants' failure to disclose these facts violated the UCL, breached these duties to disclose, and injured Plaintiffs and Class members. Plaintiffs and Class members could not reasonably have avoided these injuries.

207. These acts were likely to deceive the public, and did in fact deceive Plaintiffs, about material information.

208. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## COUNT IV
## VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
## (Cal. Bus. & Prof. Code § 17500, *et seq.*)

209. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

210. Plaintiffs bring this action on behalf of themselves and the Nationwide Class against all Defendants or, in the alternative, Plaintiffs Parker, Alexander, and Perry bring this claim on behalf of the California State Class against all Defendants.

211. California Business & Professions Code § 17500 provides that "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any

newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

212. Defendants caused to be made and/or disseminated untrue or misleading statements throughout California and the United States, which were known or should have been known to Defendants to be untrue and misleading to consumers, including Plaintiffs and Class members, such as Defendants' claims about their "rigorous" testing and that "[t]here's one thing missing from every Hyundai. Worry."[50]

213. This conduct occurred in the course of Defendants' businesses and is part of a continuing pattern or generalized course of conduct in California and throughout the United States.

214. Defendants' conduct violated the California False Advertising law because their misleading omissions concerning the safety and functionality of Class Vehicles were material and likely to deceive a reasonable consumer.

215. Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing Class Vehicles, Plaintiffs and Class members relied on Defendants' misrepresentations and/or omissions concerning the safety and reliability of the Class Vehicles. These representations were untrue because the Class Vehicles contained serious

---

[50] https://www.hyundaiusa.com/new-thinking/quality.aspx, available at https://web.archive.org/web/20130116092630/https://www.hyundaiusa.com/new-thinking/quality.aspx (last visited Aug. 19, 2019).

safety-related defects that could result in catastrophic engine failure, engine stalls, and fires. Had Defendants disclosed this, or had Plaintiffs and Class members known this, Plaintiffs and Class members would not have purchased or leased Class Vehicles at all, or would have paid significantly less for them. Plaintiffs and other Class members overpaid at the time of purchase for vehicles that were not what they bargained for and did not receive and still have not received the benefit of their bargain because, due to their safety-related defects, their vehicles were not fit to drive.

216. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, if not earlier, they continued to produce and market Class Vehicles for sale after that date. Plaintiffs and Class members purchased or leased their Vehicles after Defendants had notice of the defects.

217. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and Class members any money Defendants acquired by these practices, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT V**
**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750 *et seq.*)**

218. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

219. Plaintiffs bring this action on behalf of themselves and the Nationwide Class against all Defendants or, in the alternative, Plaintiffs Parker, Alexander, and Perry bring this claim on behalf of the California State Class against all Defendants.

220. Defendants are "person[s]" under Cal. Civ. Code § 1761(c).

221. Plaintiffs and Class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

222. The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a). Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq*., as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

223. In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the serious and dangerous engine defects affecting the Class Vehicles. The Defendants concealed the truth about the defects and failed to make any adequate effort to remedy them despite the fact that they knew about them for years.

224. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, if not earlier, they continued to produce and market Class Vehicles for sale after that date. Plaintiffs and Class members purchased or leased their Vehicles after Defendants had notice of the defects.

225. Plaintiffs and Class members had no way of discerning that Defendants had falsely and deceptively concealed these latent defects unless and until the defects manifested

themselves by causing catastrophic and sudden engine failures, stalls, or fires. Plaintiffs and Class members could not unravel this deception on their own until the announcement—too late—of the inadequate proposed recall described above. For the Hyundai Tucson, Defendants acknowledge that it relates to an “important safety issue,” and propose a recall repair that, after 6-9 years on the road, will do nothing to inspect for, repair, or compensate damage accrued as a result of a defect. For the Kia Soul, the proposed recall is also likely to be inadequate, both because it requires reprogramming an emissions component without regulatory certification and because it proposes replacing damaged engines with engines of the same defective design. Moreover, and particularly in light of Defendants’ atrocious track record of remedying similar defects in GDI engines in previous recalls of other vehicles, Plaintiffs doubt that Defendants’ proposed recall for the 1.6-liter Kia Soul or 2.4-liter Hyundai Tucson will actually fix the problems, and that any future recall repair—if such repairs ever become available—will remedy the problems with the 2.0-liter Kia Soul.

226. Defendants’ actions constitute a violation of the CLRA. Defendants knew the true nature of these vehicles as a result of pre-sale durability testing, of complaints and warranty claims by consumers to Defendants directly as well as to NHTSA, and of their previous failed recalls of related engines for similar defects.

227. Defendants owed Plaintiffs a duty to disclose the defects and their resulting safety risks because they:

A. Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States with dangerous defects;

B. Intentionally concealed the foregoing from regulators, Plaintiffs, and Class members; and/or

C. Made incomplete representations, via earlier recalls of related vehicles for similar defects, concerning the safety and presence of defects in the Class Vehicles, while actually purposefully withholding material facts from Plaintiffs that contradicted these representations.

228. Defendants' unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, roadworthiness, and value of the Class Vehicles.

229. Plaintiffs and Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment of and failure to disclose material information. Plaintiffs and Class members who purchased or leased Class Vehicles would not have done so at all, or would have paid significantly less for them, if their true nature was disclosed by Defendants and/or known by Plaintiffs and Class members.

230. Meanwhile, Defendants had an ongoing duty to all of their customers to refrain from unfair and deceptive practices under the CLRA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

231. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

232. Under Cal. Civ. Code § 1780(a), Plaintiffs and the California Class seek monetary relief against Defendants measured as the overpayment for their vehicles caused by Defendants' violations of the CLRA as alleged herein.

233. Plaintiffs also seek punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the California Class to potential cruel and unjust hardship as a result. Defendants intentionally and willfully deceived Plaintiffs on life-or-death matters, and concealed material facts that only Defendants knew. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

234. Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, and attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

235. Plaintiffs, through undersigned counsel, provided Defendants notice of their violations of the CLRA in compliance with Cal. Civ. Code § 1782(a) on March 4, 2019.

**COUNT VI**
**VIOLATIONS OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTIES**
**(Cal. Civ. Code §§ 1791.1 & 1792)**

[DISMISSED WITH PREJUDICE]

**COUNT VII**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(O.R.C. §§ 1345.01, *et seq.*)**

236. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

237. Plaintiff Ronfeldt brings this Count on behalf of himself and the Ohio State Class.

238. Plaintiff Ronfeldt and the Ohio State Class are "consumers" within the meaning of Ohio Revised Code §1345.01(A)

239. Defendants are "suppliers" within the meaning of Ohio Revised Code §1345.01(C).

240. Plaintiff Ronfeldt, the Ohio State Class, and the Defendants all engaged in a "consumer transaction" within the meaning of Ohio Revised Code §1345.01(D).

241. The Ohio Consumer Sales Practice ("CSPA") makes it unlawful for suppliers to "commit an unfair or deceptive act or practice in connection with a consumer transaction." O.R.C. § 1345.02, *et seq*.

242. Defendants violated the CSPA by selling Class Vehicles with safety-related defects making the vehicles prone to catastrophic and sudden engine failures and stalling at speed, often resulting in fires.

243. Prior to and throughout Plaintiff Ronfeldt's and the Ohio State Class's purchases and leases of their Defective Vehicles, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices by, among other things, representing that the defective Class Vehicles had characteristics, uses or benefits that they do not have; that the Class Vehicles were of a particular standard, quality, or grade that they were not; and, that the Class Vehicles were made available to Plaintiff and the Ohio State Class for a reason that does not exist. *See* O.C.R. § 1345.02(B)(1), (2), and (4).

244. Additionally, Defendants knowingly made misleading statements and representations with respect to the Class Vehicles (and particularly their defective engines) that Defendants knew the Ohio Plaintiff and the Ohio State Class would likely rely upon in deciding whether to purchase Defendants' Vehicles. *See* O.C.R. §1345.03(6).

245. In the course of Defendants' business, they willfully failed to disclose the safety-related defects in the Class Vehicles as described above. Defendants also actively concealed the

engine defects when they learned of them. Accordingly, Defendants engaged in unfair and deceptive acts or practices and unconscionable acts or practices.

246. Defendants knowingly misrepresented the Class Vehicles as fit for the purpose for which they were intended, when, in fact, Defendants knew the Class Vehicles were unable to perform as advertised.

247. These acts and practices have deceived Plaintiff Ronfeldt and the Ohio State Class and are likely to, and did, deceive the public. In failing to disclose the engine defects in the Class Vehicles and suppressing material facts from the Ohio Plaintiff and the Ohio State Class members, Defendants breached their duties to disclose these facts.

248. The omissions and acts of concealment by the Defendants pertained to information that was material to Plaintiff Ronfeldt and Ohio State Class members, as it would have been to all reasonable consumers.

249. Defendants knew that their conduct violated the CSPA.

250. Plaintiff Ronfeldt and the Ohio State Class have suffered injury in fact and actual damages as a direct and proximate result of Defendants' material omissions and misrepresentations. Had Plaintiff Ronfeldt and the Ohio State Class known about the engine defect or defects in the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

251. Plaintiff Ronfeldt and the Ohio State Class have suffered actual damages and ascertainable loss as a direct and proximate result of the Defendants' violations of the CSPA, including but not limited to diminished and or complete lost value for the Class Vehicles they purchased or leased; lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendants' violations of the CSPA

252. Pursuant to Ohio Revised Code § 1345.09, for each violation of the CSPA, Plaintiff Ronfeldt and the Ohio State Class members seek the actual damages resulting from each such violation, plus an amount not exceeding five thousand dollars in noneconomic damages, together with equitable relief as determined by the Court to be proper. Specifically, Plaintiff Ronfeldt and the Ohio State Class ask the Court to enjoin the Defendants from further unfair or deceptive acts or practices; to order that Defendants return all amounts that Plaintiff and the Ohio State Class paid to Defendants for purchase and/or lease of the Class Vehicles; to award attorneys' fees and costs against the Defendants; to assess punitive damages as the Court finds just and proper to punish Defendants for their willful, intentional and malicious plans to deceive, defraud and injure Plaintiff Ronfeldt and the Ohio State Class; and to order any other just and proper relief available under the CSPA.

**COUNT VIII**
**VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT**
**(O.R.C. §§ 4165.01, *et seq.*)**

[DISMISSED WITH PREJUDICE].

**COUNT IX**
**VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(O.R.C. §§ 1302.27 and 1310.19)**

253. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

254. Plaintiff Ronfeldt brings this Count on behalf of himself and the Ohio State Class.

255. The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under Ohio Rev. Code § 1302.01(4).

256. With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 13.10.01(A)(20).

257. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

258. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.19.

259. Defendants, and in particular KMA, transacted business through its flagship dealer in Northwest Ohio, Taylor Kia of Toledo.

260. On information and belief, through the operation of KMA's contracts and agreements, and through day-to-day operational practices, Taylor Kia of Toledo operated under the guidance of, and acted primarily for the benefit of, the Kia Defendants.

261. At all times relevant to this Complaint with respect to Plaintiff Ronfeldt—including both at the time of purchase and after the engine failure, particularly including the denial of responsibility to repair, replace, or reimburse for the engine failure—Taylor Kia of Toledo acted to the benefit of the Kia Defendants.

262. Defendant KMA solely made the decision to deny warranty coverage to repair, replace, or reimburse for Plaintiff Ronfeldt's defective failed engine.

263. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were not and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they contain engines that are prone to sudden catastrophic failure and/or fires, rendering the vehicles unreliable, highly dangerous, and unfit to drive.

264. Defendants were provided notice of these engine defects through numerous consumer complaints and incident reports over the years, specifically pertaining to the engines in the Class Vehicles, but also those relating to similar gasoline direct injection engines manufactured by Defendants for their other vehicles, and Defendants ignored, denied and concealed the dangerous engine defects for years prior to taking any action or issuing any recalls that may (or may not) address the defects.

265. As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiff Ronfeldt and the Ohio State Class members have been damaged in an amount to be proven at trial.

**COUNT X**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECION LAW**
**(73 P.S. §§ 201-1, *et seq.*)**

266. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

267. This claim is brought pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "Pennsylvania UTPA"), 73 P.S. § 201-1, *et seq.*

268. The DiPardo Plaintiffs bring this action on behalf of themselves and the Pennsylvania State Class.

269. The DiPardos, Class members, and Defendants are "person[s]" within the meaning of 73 P.S. § 201-2(2).

270. Defendants were engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

271. The Pennsylvania UTPA defines and makes unlawful "unfair methods of competition" and "unfair or deceptive acts or practices" to include: "(v) Representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . ; (vii) Representing that goods . . . are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; (ix) Advertising goods . . . with intent not to sell them as advertised . . . ; (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4).

272. In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the serious and dangerous safety-related defects affecting the Class Vehicles' engines, which can cause the vehicles to stall while driving, at speed, then burst into flames. The Defendants failed to disclose and/or concealed the truth about the defects and failed to make any adequate effort to remedy them despite the fact that they knew about them for years.

273. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, if not earlier, they continued to produce and market Class Vehicles for sale after that date. The DiPardo Plaintiffs purchased or leased their Vehicles after May 2012, at which time Defendants were on notice of the defects.

274. Defendants violated the Pennsylvania UTPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

275. Defendants' acts and practices, as described throughout this Complaint, constitute "unfair methods of competition" and "unfair or deceptive acts or practices," that are unlawful, as enumerated in 73 P.S. § 201-2(4).

276. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Pennsylvania Plaintiffs and the Class.

277. Defendants knew that their conducted violated the Pennsylvania UTPA.

278. Defendants' fraudulent concealment of the true characteristics of the safety of their Class Vehicles were material to the Pennsylvania Plaintiffs and Class members.

279. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices, complained of herein, affect the public interest.

280. Defendants had an ongoing duty to their customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA. All owners of Class Vehicles suffered ascertainable losses in the form of overpayment at the time of purchase and diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

281. As a direct and proximate result of Defendants' violations of the Pennsylvania UTPA, the Pennsylvania Plaintiffs and the Class have suffered injury-in-fact and/or actual damages.

282. Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, for actual and treble damages, punitive damages, and attorneys' fees, costs, and any other relief available under the Pennsylvania UTPA that the Court deems just and proper.

**COUNT XI**
**VIOLATIONS OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(13 Pa. C.S.A. § 2A212)**

283. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

284. The DiPardo Plaintiffs bring this action on behalf of themselves and the Pennsylvania State Class.

285. Defendants are and were at all relevant times "merchants," "sellers," and "lessors" with respect to motor vehicles, including the Class Vehicles.

286. The Class Vehicles are and were at all relevant times "goods."

287. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

288. The Class Vehicles, when sold or leased, and at all times thereafter, were not fit for the ordinary purpose for which vehicles are used. Specifically, as described in this Complaint, the Class Vehicles contained serious safety-related defects—namely, that the vehicles' engines can suddenly stall, while driving at speed, then burst into flames.

289. As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

**COUNT XII**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code §§ 19.86.010, *et seq*.)**

290. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

291. Plaintiffs Short, Snider, and Wight bring this action on behalf of themselves and the Washington State Class.

292. Defendants, Plaintiffs Short, Snider, and Wight, and members of the Washington State Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

293. Defendants are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

294. The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

295. In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the serious and dangerous engine defects affecting the Class Vehicles. The Defendants concealed the truth about the defects and failed to make any effort to remedy them despite the fact that they knew about them for years.

296. Plaintiffs and Class members had no way of discerning that Defendants had falsely and deceptively concealed these latent defects unless and until the defects manifested themselves by causing catastrophic and sudden engine failures, stalls, or fires. Plaintiffs and Class members could not unravel this deception on their own until the announcement—too late—of the inadequate proposed recalls described above. For the Hyundai Tucson, Defendants acknowledge that the defect relates to an "important safety issue," and propose a recall repair that, after six to nine years on the road, will do nothing to inspect for, repair, or compensate damage accrued as a result of a defect. For the Kia Soul, the proposed recall is also likely to be inadequate, both because it requires reprogramming an emissions component without regulatory certification and because it proposes replacing damaged engines with engines of the same defective design. Moreover, and particularly in light of Defendants' atrocious track record of remedying similar defects in GDI engines in previous recalls of other vehicles, Plaintiffs doubt

that Defendants' proposed recall for the 1.6-liter Kia Soul or 2.4-liter Hyundai Tucson will actually fix the problems, and that any future recall repair—if such repairs ever become available—will remedy the problems with the 2.0-liter Kia Soul.

297. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, they continued to produce and market Class Vehicles for sale after that date. Plaintiffs Snider and Short and Class members purchased or leased their vehicles after May 2012, at which time Defendants were on notice of the defects.

298. Defendants' actions constitute a violation of the Washington CPA. Defendants knew the true nature of these vehicles as a result of pre-sale durability testing, of complaints and warranty claims by consumers to Defendants directly as well as to NHTSA, and of their previous failed recalls of related engines for similar defects.

299. Defendants owed Plaintiffs a duty to disclose the defects and their resulting safety risks because they:

A. Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States with dangerous safety-related defects;

B. Intentionally concealed the foregoing from regulators, Plaintiffs, and Class members; and/or

C. Made incomplete representations, via earlier recalls of related vehicles for similar defects, concerning the safety and presence of defects in the Class Vehicles, while actually purposefully withholding material facts from Plaintiffs that contradicted these representations.

300. Defendants' unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, roadworthiness, and

value of the Class Vehicles.

301. Plaintiffs and Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment of and failure to disclose material information. Plaintiffs and Class members who purchased or leased Class Vehicles would not have done so at all, or would have paid significantly less for them, if their true nature was known.

302. Meanwhile, Defendants had an ongoing duty to all of their customers to refrain from unfair and deceptive practices under the Washington CPA in the course of their business.

303. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

304. Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and the Washington Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled. *Id*.

**COUNT XIII**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212)**

305. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

306. Plaintiffs Short, Snider, and Wight bring this Count on behalf of themselves and the Washington State Class against all Defendants.

307. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

308. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

309. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

310. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

311. Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for the ordinary purpose for which they were sold—namely, providing safe and reliable transportation. Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiffs and Washington State Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

## COUNT XIV
## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
## (W. Va. Code §§ 46A-1-101, *et seq.*)

312. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

313. Plaintiff Twigger brings this Count on behalf of himself and the West Virginia State Class.

314. Plaintiff Twigger, the West Virginia State Class, and Defendants are "consumers" and engaged in "consumer transaction[s]" within the meaning of West Virginia Code § 46A-6-102(2).

315. Defendants engaged in "trade" or "commerce" as defined by West Virginia Code § 46A-6-102(6).

316. The West Virginia Consumer Credit and Protection Act ("WVCCPA") makes it unlawful to engage in any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

317. Defendants violated the WVCCPA by selling Class Vehicles with defective engines, containing safety-related defects that made Class Vehicles prone to sudden catastrophic engine failure, stalling, and fires.

318. Prior to and throughout Plaintiff Twigger's and the West Virginia Class members' purchases and leases of their Class Vehicles, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices by, among other things, representing that the Class Vehicles had characteristics, uses, benefits and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and engaging in other conduct creating a likelihood of confusion or of misunderstanding. See WV Code § 46A-6-102(7)(E), (G), (I) and (L).

319. Even though Defendants knew of the engine defects at least as early as May 2012 for the Souls and June 2013 for the Tucsons, they continued to produce and market Class Vehicles for sale after that date. Plaintiff Twigger and Class members purchased or leased their Vehicles after Defendants had notice of the defects.

320. In the course of their business, Defendants willfully failed to disclose the safety-related engine defects in the Class Vehicles as described above. Defendants also actively concealed the true characteristics, qualities, and grades of the engines in the Class Vehicles when Defendants gained this information. Accordingly, Defendants engaged in unfair and deceptive acts or practices.

321. Defendants knowingly misrepresented the Class Vehicles as fit for the purpose for which they were intended, when, in fact, Defendants knew the Class Vehicles were unable to perform as advertised.

322. These acts and practices have deceived Plaintiff Twigger and the West Virginia State Class. In failing to disclose the true characteristics and qualities of the Class Vehicles and suppressing material facts from Plaintiff Twigger and the West Virginia State Class members, Defendants breached their duties to disclose these facts.

323. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Twigger and the West Virginia State Class members, as it would have been to all reasonable consumers.

324. Defendants knew that their conduct violated the WVCCPA.

325. Plaintiff Twigger and the West Virginia State Class have suffered injury in fact and actual damages as a direct and proximate result of Defendants' material omissions and misrepresentations. Had Plaintiff Twigger and the West Virginia State Class known the true characteristics and qualities of the engines in the Class Vehicles, they would not have purchased the Class Vehicles or would have paid substantially less for them. In satisfaction of WV Code § 46A-6-106(c), and § 46A-6A-3(a) and 5(c), and pursuant to this Court's order dated March 15, 2020, Plaintiff Twigger sent statutory notice letters to all Defendants by certified mail, return

receipt requested, on March 18, 2020. These letters alleged and specified violations of the WVCCPA and provided Defendants the opportunity to make a cure offer within 10 days of receipt of the letter. KMA received the letter on March 31, 2020; KMC received the letter on April 21, 2020; and HMA received the letter on March 19, 2020. None of the Defendants have responded.

326. Plaintiff Twigger and the West Virginia State Class have suffered actual damages and ascertainable loss as a direct and proximate result of the Defendants' violations of the WVCCPA, including but not limited to diminished and or complete lost value for the Class Vehicles they purchased or leased; lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendants' violations of the WVCCPA.

327. Pursuant to WV Code § 46A-6-106(a), for each violation of the WVCCPA, Plaintiff Twigger and the West Virginia State Class seek the actual damages resulting from each such violation, or $200, whichever is greater, together with equitable relief as determined by the Court to be proper. Specifically, Plaintiff Twigger and the West Virginia State Class ask the Court to enjoin Defendants from further unfair or deceptive acts or practices; to order that Defendants return all amounts that Plaintiff Twigger and the West Virginia State Class paid to Defendants for purchase and/or lease of the Class Vehicles; to award attorneys' fees and costs against Defendants; to assess punitive damages as the Court finds just and proper to punish Defendants for their willful, intentional and malicious plan to deceive, defraud and injure Plaintiff Twigger and the West Virginia State Class; and to order any other just and proper relief available under the WVCCPA.

**COUNT XV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(W. Va. Code §§ 46-2-314 and 46-2A-212)**

328. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

329. Plaintiff Twigger brings this Count on behalf of himself and the West Virginia State Class.

330. Defendants were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

331. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

332. The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

333. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

334. Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for the ordinary purpose for which they were sold—namely, providing safe and reliable transportation, free from the risk of sudden engine stalling and fire.

335. Defendants' breaches of the implied warranty of merchantability caused damage to the West Virginia State Class. The amount of damages due will be proven at trial.

**COUNT XVI**
**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**
**(Ariz. Rev. Stat. §§ 44–1521 *et seq.*)**

336. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

337. Plaintiff Alexander brings this Count on behalf of herself and the Arizona Class against all Defendants.

338. Defendants, Arizona Plaintiff, and Class members are "persons" under the meaning of Ariz. Rev. Stat. § 44-1521(6).

339. Class Vehicles are "goods" or "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

340. The Arizona Plaintiff and Class members are "consumers" within the meaning of Ariz. Rev. Stat. §§ 44-1521–1534.

341. The purchase or lease of a Class Vehicle constitutes a "transaction," within the meaning of Ariz. Rev. Stat. §§ 44-1521–1534.

342. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

343. Defendants concealed Class Vehicles' defective engines that made them unsafe to drive. Defendants did not tell Plaintiffs and Class members about the engine defects. Even when

Defendants announced recalls for certain Class Vehicles, Defendants continued to conceal the defects in others and concealed that the recall did not address the root cause of the problem.

344. Defendants violated the Arizona CFA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

345. Defendants' acts and practices, as discussed throughout this Complaint, constitute "unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce" by Defendants, that are unlawful, as enumerated in ARIZ. REV. STAT. §§ 44-1521-1534.

346. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Missouri Plaintiff and the Class.

347. Defendants knew or should have known that their conducted violated the Arizona CFA.

348. Defendants' fraudulent concealment of the true characteristics of Class Vehicles' engine defects were material to the Arizona Plaintiff and Class members.

349. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

350. Defendants had an ongoing duty to their customers to refrain from unfair and deceptive practices under the Arizona CFA. All owners of Class Vehicles suffered ascertainable

loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

351. As a direct and proximate result of Defendants' violations of the Arizona CFA, the Arizona Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

352. Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs also seek punitive damages because Defendants' conduct was wanton or reckless, was conducted out of spite or ill-will, or with a reckless indifference to the interests of others.

353. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

**COUNT XVII**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ariz. Rev. Stat. §§ 47–2314 *et seq.*)**

354. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

355. Plaintiff Alexander brings this Count on behalf of herself and the Arizona Class against all Defendants.

356. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. § 47–2104 and "sellers" of motor vehicles under § 47–2103(A)(4).

357. The Class Vehicles were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. § 47–2105.

358. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. § 47–2314.

359. Defendants sold and/or leased Class Vehicles that they knew were not in merchantable condition and/or fit for the ordinary purpose for which they were sold—namely, providing safe and reliable transportation. Defendants did not disclose their knowledge that Class Vehicles were not in merchantable condition and/or fit for the ordinary purpose for which they were sold, in order to induce Plaintiff and Class members to purchase Class Vehicles.

360. Defendants' breach of the implied warranty of merchantability caused damage to Plaintiff Alexander and Arizona State Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XVIII**
**VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**(Conn. Gen. Stat. §§ 42-110a *et seq.*)**

361. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

362. Plaintiff Frazier ("Plaintiff," for the purposes of the Connecticut causes of action) brings this count individually and on behalf of the other members of the Connecticut Class.

363. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*, prohibits "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

364. By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

365. Defendants were provided notice of the engine defect through numerous complaints filed against them directly and through their dealers, as well as their own internal engineering knowledge.

366. Defendants' omissions regarding the engine defect, described above, which causes catastrophic engine failure or fire, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or pay the same price for) the Class Vehicles.

367. Defendants intended for Plaintiff and the other Class members to rely on Defendants' omissions regarding the engine defect.

368. Plaintiff and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described engine defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

369. Had Defendants disclosed all material information regarding the engine defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

370. Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

371. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Connecticut Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the engine defect been disclosed. Plaintiff and other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover

the actual damages, attorneys' fees and costs, and all other relief allowed under Conn. Gen. Stat. §§ 42-110a, *et seq*.

**COUNT XIX**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Conn. Gen. Stat. §§ 42a-2-314 and 42a-2a-504)**

372. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

373. Plaintiff Frazier ("Plaintiff" for the purposes of the Connecticut causes of action) brings this count individually and on behalf of the other members of the Connecticut Class.

374. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under C.G.S.A. §§ 42a-2-104 and 42a-2a-501.

375. Pursuant to C.G.S.A. §§ 42a-2-314 and 42a-2a-504, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

376. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and no in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Engine defect which causes the Class Vehicles' to catastrophically fail or catch fire.

377. Defendants were provided notice of the engine defect through numerous complaints filed with NHTSA and warranty claims made through their dealers, as well as their own internal engineering knowledge. And after his car was totaled, Plaintiff Frazier submitted a written request for reimbursement to KMA, which declined to compensate Frazier or acknowledge fault. In addition, and in the alternative, a notice letter would have been futile under

the circumstances because Plaintiff's vehicle was irreparably destroyed by the engine fire, making any cure impossible.

378. Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Defendants' breach of the implied warranty of merchantability.

379. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT XX**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. §§ 407.010 *et seq.*)**

380. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

381. Plaintiff Carduff brings this Count on behalf of herself and the Missouri Class against all Defendants.

382. Defendants, Missouri Plaintiffs, and Class members are "persons" under the meaning of Mo. Rev. Stat. § 407.010(5).

383. Defendants were engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

384. Class Vehicles are "merchandise" within the meaning of Mo. Rev. Stat. § 407.010(4).

385. The Missouri Merchandising Practices Act prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

386. Defendants concealed Class Vehicles' defective engines that made them unsafe to drive. Defendants did not tell Plaintiffs and Class members about the engine defects. Even when Defendants announced recalls for certain Class Vehicles, Defendants continued to conceal the defects in others and concealed that the recall did not address the root cause of the problem.

387. Defendants violated the Missouri MPA by, at minimum, representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

388. Defendants' acts and practices, as described throughout this Complaint, constitute violations of Mo. Rev. Stat. § 407.020(1).

389. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead the Missouri Plaintiff and the Class.

390. Defendants knew or should have known that their conducted violated the Missouri MPA.

391. Defendants' fraudulent concealment of the true characteristics of Class Vehicles' engine defects were material to the Missouri Plaintiff and Class members.

392. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

393. Defendants had an ongoing duty to their customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Class Vehicles suffered

ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

394. Plaintiff Carduff repeatedly voiced concerns about the vehicle to the dealership from which she purchased the vehicle. She also paid out of pocket for a tow to Oakes Kia for repair, where the service department informed her that the vehicle required a new engine and catalytic converter to be drivable. KMA offered to pay for $3,000 toward the engine replacement, but only if Ms. Carduff and her husband signed a broad release of all potential legal claims. Plaintiff Carduff refused to sign the release and has paid approximately $9,712.94 out of pocket for these repairs to date.

395. As a direct and proximate result of Defendants' violations of the Missouri MPA, the Missouri Plaintiff and the Class have suffered injury-in-fact and/or actual damage.

396. Pursuant to Mo. Rev. Stat. § 407.025, Plaintiffs seek actual damages, attorneys' fees, punitive damages, restitution, civil penalties, and any other relief available under the Missouri MPA that the Court deems just and proper.

**COUNT XXI**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mo. Rev. Stat. §§ 407.2–314 *et seq.*)**

397. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

398. Plaintiff Carduff brings this Count on behalf of herself and the Missouri Class against all Defendants.

399. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Rev. Stat. § 407.2–104, and "sellers" of motor vehicles under § 407.2–103(1)(d).

400. The Class Vehicles were at all relevant times "goods" within the meaning of Mo. Rev. Stat. §§ 407.2–105.

401. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to §§ 407.2–314.

402. Defendants sold and/or leased Class Vehicles that they knew were not in merchantable condition and/or fit for the ordinary purpose for which they were sold—namely, providing safe and reliable transportation. Defendants did not disclose their knowledge that Class Vehicles were not in merchantable condition and/or fit for the ordinary purpose for which they were sold, in order to induce Plaintiff and Class members to purchase Class Vehicles.

403. Plaintiff Carduff repeatedly voiced concerns about the vehicle to the dealership from which she purchased the vehicle. She also paid out of pocket for a tow to Oakes Kia for repair, where the service department informed her that the vehicle required a new engine and catalytic converter to be drivable. KMA offered to pay for $3,000 toward the engine replacement, but only if Ms. Carduff and her husband signed a broad release of all potential legal claims. Plaintiff Carduff refused to sign the release and has paid approximately $9,712.94 out of pocket for these repairs to date.

404. Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiffs and Missouri State Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XXII**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq*.)**

405. Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

406. Plaintiff Pressley ("Plaintiff," for the purposes of the North Carolina causes of action) brings this Count individually and on behalf of the other members of the North Carolina Class.

407. Defendants engaged in unlawful, unfair, and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by advertising, selling, and warranting the defective Class Vehicles.

408. Defendants knew that the Class Vehicles suffered from the engine defect that results in catastrophic engine failure, stalling, and fires.

409. In advertising, selling, and warranting the Class Vehicles, Defendants omitted material facts concerning the engine defect that results in catastrophic engine failure, stalling, and fires. Defendants failed to give Plaintiff and the other Class members sufficient notice or warning regarding this defect.

410. Defendants intended that Plaintiff and the other Class members rely upon Defendants' omissions when purchasing vehicles containing the 2.0-liter "Nu" Engines.

411. Plaintiff and the other Class members were deceived by Defendants' concealment of the defect.

412. Defendants' conduct was in commerce and affected commerce.

413. As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, Plaintiff and the other North Carolina Class members have been damaged and are entitled to recover actual and treble damages, as well as attorneys' fees and costs, and all other relief allowed under N.C. Gen. Stat §§ 75-16 and 75-16.1.

**COUNT XXIII**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212)**

414. Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

415. Plaintiff Pressley brings this Count individually and on behalf of the other members of the North Carolina Class.

416. Defendants are and were at all relevant times a merchant with respect to motor vehicles under N.C. Gen Stat. § 25-2-314 and 25-2A-212.

417. Pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

418. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the engine defect which causes catastrophic engine failure, stalling, and fires.

419. Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Defendant's breach of the warranty of merchantability.

420. Defendants were provided notice of the engine defect through numerous complaints filed against them directly and through their dealers, as well as their own internal engineering knowledge. In addition, and in the alternative, the notice letter would have been futile under the circumstances because Plaintiff's vehicle was irreparably destroyed by the engine defect as described above, making any cure impossible.

421. As a direct and proximate result of Defendant's breach of the warranty of merchantability, Plaintiff and the other North Carolina Class members have been damaged in an amount to be proven at trial.

**COUNT XXIV**
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT**
**(Tex. Bus. & Com. Code §§ 17.01, *et seq.*)**

422. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

423. Plaintiff Smith ("Plaintiff" for purposes of the Texas causes of action) brings this Count individually and on behalf of the other members of the Texas Class.

424. The Texas Deceptive Trade Practices—Consumer Protection Act ("TDTPA") states that it is unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

425. By the conduct described in detail above and incorporated herein, Defendants engaged in false, misleading and deceptive trade practices.

426. Defendants were notified of the engine defect by letter sent via certified mail, return receipt requested on May 1, 2020, on behalf of Plaintiff Smith. Defendants were also provided notice of the engine defect through numerous complaints filed against them directly and through their dealers, as well as their own internal engineering knowledge. In addition, and in the alternative, the notice and cure letter contemplated by Tex. Bus. & Com. Code § 17.505 would have been futile under the circumstances because Plaintiff Smith's vehicle was irreparably destroyed by the engine fire, making any cure impossible.

427. Defendants' omissions regarding the engine defect, described above, that results in Class Vehicles prone to sudden catastrophic engine failure, stalling, and fires. Engine damage within the 2.0-liter "Nu" Engines and consequences thereof, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

428. Defendants intended for Plaintiff and the other Class members to rely on Defendants' omissions regarding the engine defect.

429. Plaintiff and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described engine defect that results in in Class Vehicles prone to sudden catastrophic engine failure, stalling, and fires, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

430. Had Defendants disclosed all material information regarding the engine defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

431. Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

432. In addition to being deceptive, the business practices of Defendants were unfair because Defendants knowingly sold Plaintiff and the other Class members Class Vehicles with defective engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the

circumstances. Moreover, in light of Defendants' exclusive knowledge of the engine defect, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

433. As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff and the other Texas Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Texas Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the engine defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the TDTPA.

**COUNT XXV**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tex. Bus. & Com. Code §§ 2.314 and 2A.212, *et seq.*)**

434. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

435. Plaintiff Smith ("Plaintiff" for purposes of the Texas causes of action) brings this Count individually and on behalf of the Texas Class.

436. Defendants are and were at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104 and 2A.103.

437. Pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

438. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in

merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the engine defect making them prone to sudden catastrophic engine failure, stalling, and fires.

439. Defendants were notified of the engine defect by letter sent via certified mail, return receipt requested on May 1, 2020, on behalf of Plaintiff Smith. Defendants were also provided notice of the engine defect through numerous complaints filed against it directly and through their dealers, as well as their own internal engineering knowledge. In addition and in the alternative, the notice would have been futile under the circumstances because Plaintiff Smith's vehicle was irreparably destroyed by the engine fire, making any cure impossible.

440. Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Defendants' breach of the warranty of merchantability.

441. Defendants were provided notice of the engine defect through numerous complaints filed against them directly and through their dealers, as well as their own internal engineering knowledge. In addition, and in the alternative, the notice letter would have been futile under the circumstances because Plaintiff Smith's vehicle was irreparably destroyed by the engine fire, making any cure impossible.

442. As a direct and proximate result of Defendants' breach of the warranty of merchantability, Plaintiff and the other Texas Class members have been damaged in an amount to be proven at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide Class and State Classes, respectfully request that the Court grant certification of the proposed Nationwide Class and State Classes, including the appointment of Plaintiffs as named

representatives thereof, the appointment of the undersigned as Class Counsel, and the designation of any appropriate issue classes and/or subclasses, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendants, as follows:

A. A declaration that any applicable statutes of limitations are tolled due to the fraudulent concealment alleged in this Complaint, and that Defendants are estopped from relying on any statutes of limitation in defense;

B. An order enjoining Defendants from continuing the unlawful, unfair, and fraudulent business practices alleged herein;

C. Appropriate injunctive and equitable relief requiring Defendants to repair and/or buy back all Class Vehicles, and to fully reimburse and make whole all Class members for all costs and economic losses associated therewith;

D. Damages, including actual, compensatory, restitution, incidental, consequential, costs, multiple or punitive under applicable law, and disgorgement in an amount to be determined at trial;

E. A determination that Defendants are financially responsible for all Class notice and administration of Class relief, including but not limited to accurate consumer-facing information about the defects at issue;

F. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

G. An award of costs and attorneys' fees;

H. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

I. Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 4th day of May, 2020.

KELLER ROHRBACK L.L.P.

By *s/Lynn Lincoln Sarko*
By *s/Gretchen Freeman Cappio*
By *s/Ryan McDevitt*
By *s/Maxwell H. Goins*

Lynn Lincoln Sarko #16569
Gretchen Freeman Cappio #29576
Ryan McDevitt #43305
Maxwell Goins #54130
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900
Fax (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com
mgoins@kellerrohrback.com

Benjamin L. Bailey, *pro hac vice*
Jonathan D. Boggs, *pro hac vice*
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
Fax (304) 342-1110
bbailey@baileyglasser.com
jboggs@baileyglasser.com

W. Daniel "Dee" Miles, III (*pro hac vice to be filed*)
H. Clay Barnett, III (*pro hac vice to be filed*)
J. Mitch Williams (*pro hac vice be filed*)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
272 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com
Mitch.Williams@Beasleyallen.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Ryan McDevitt, hereby certify that on May 4, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Western District of Washington using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Ryan McDevitt*
Ryan McDevitt